484 F.2d 70
 6 Fair Empl.Prac.Cas. 447, 6 Empl. Prac. Dec. P 8823
UNITED STATES of America, By Ramsey CLARK, Attorney General, Appellant,
v.
CHESTERFIELD COUNTY SCHOOL DISTRICT, CHESTERFIELD COUNTY,
SOUTH CAROLINA, et al., Appellees.
 No. 73-1141.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 6, 1973.
Decided Sept. 10, 1973.
 
 Brian K. Landsberg, Atty., U. S. Dept. of Justice (J. Stanley Pottinger, Asst. U. S. Atty. Gen., Thomas M. Keeling and Samuel J. Flanagan, Attys., U. S. Dept. of Justice, and John K. Grisso, U. S. Atty., on brief), for appellant.
 H. Simmons Tate, Jr., Columbia, S. C. (Boyd, Knowlton, Tate & Finlay and J. Donald Dial, Jr., Columbia, S. C., on brief), for appellees.
 (Richard M. Sharp, David Rubin and Shea & Gardner, Washington, D. C., on brief, The National Education Assn. and the South Carolina Education Assn., amicus curiae. Daniel R. McLeod, Atty. Gen., of South Carolina, Hardwick Stuart, Jr., Asst. Atty. Gen., on brief for The State Superintendent of Education and the State Attorney General, amicus curiae).
 Before WINTER and WIDENER, Circuit Judges, and KAUFMAN, District Judge.
 WINTER, Circuit Judge:
 
 
 1
 In the course of effecting a court-ordered plan of desegregation, defendants dismissed ten black teachers who had been continuously employed for many years. One of the ten was a "B" certificate teacher who was purportedly dismissed for cause. The remaining nine were "C" certificate teachers who were dismissed because of a newly adopted policy against employing "C" certificate teachers.
 
 
 2
 By motion for supplemental relief in which it alleged that the dismissals were racially discriminatory, the United States, which had instituted the main desegregation case, sought reinstatement of the teachers with back pay and restoration of other benefits. The district court denied relief. It concluded that there was no evidence that the "B" certificate teacher, Mrs. Mary T. Funderburk, was discharged for racial reasons. It found also that the nine "C" certificate teachers were dismissed as a result of the application of a racially non-discriminatory policy to upgrade faculty and improve the quality of public education. We agree with respect to Mrs. Funderburk, but disagree with respect to the remaining nine. Accordingly, we affirm in part and reverse in part, remanding for further proceedings.
 
 I.
 
 3
 The desegregation plan for the defendant school district was approved by the district court by its orders dated September 30, 1969 and May 26, 1970, for implementation in the 1970-71 school year. An earlier attempt to achieve voluntary or negotiated desegregation for the previous school year had failed because of opposition from the white community. Freedom of choice, although ineffective to achieve a unitary system, had begun in the 1965-66 school year. During the school years 1967-68 to 1970-71, there was an overall decline of eleven in the total number of teachers in the system. There was a more marked and continuing decline in the number of black teachers and the systemwide percentage of black teachers. During the three-year period, the number of black teachers decreased by forty-six, while the number of white teachers increased by thirty-five; and the percentage of black teachers decreased from 37.8% to 25.9%, with corresponding increases in the percentages of white teachers.[1]
 
 
 4
 In the Chesterfield County school system there is a yearly determination of whether to rehire or to terminate each teacher. Prior to the 1970-71 school year, the determination was made by the Chesterfield County Board of Education upon the recommendation of the local advisory council for the school in which a teacher was employed. The advisory council usually based its recommendation upon that of the principal of the school, who completed a uniform rating sheet, devised by the Director of Instruction, on which his recommendation was set forth. The policy not to rehire "C" certificate teachers (except where higher grade teachers were not obtainable) was initiated by the Superintendent of the system on October 20, 1969, to be applicable to the school year 1970-71. The Board of Education did not formally adopt it, but the policy was nevertheless followed by the advisory councils.
 
 
 5
 The nine "C" certificate teachers were not rehired in accordance with this policy. Six of them were recommended for rehiring by their principals. Three were not, but solely because their superintendents believed that the policy made what would have been their recommendation to rehire them superfluous. Eight of the nine teachers had had from four to thirty years' teaching experience, the total teaching experience of the ninth being unknown; and two of the eight had four years' experience-one, six years' experience; two twenty-six years' experience; and one, twenty-seven years' experience-in the Chesterfield schools. No white teacher was not rehired as a result of defecto adoption and application of the policy.
 
 
 6
 To teach in the public schools of South Carolina, a person must have a teaching certificate issued by the State Board of Education. So far as is pertinent here, the State Board issues certificates graded from "A" through "D", based upon a teacher's score on the common examination of the National Teachers' Examination (hereafter NTE).[2] An applicant for a South Carolina teacher's certificate must take the NTE. He may take it as many times as he desires, and his best score is used to determine the grade of his certificate. A certificate, once issued, remains valid for an indefinite period unless it is supplanted by a certificate of a higher grade. The score requirements for the various grades have been raised prospectively four times since 1945, but the changes did not affect the grades of outstanding certificates obtained under the previously lower score requirements.[3] The grade of certificate that an applicant obtains has no apparent effect on the teaching duties which may be assigned him, but it is a measure of the degree of state financial contribution toward his salary.
 
 
 7
 Because South Carolina has at different times assigned different letter grades to the same NTE scores, defendants, for the 1970-71 school year, retained twenty-six teachers (fifteen black and eleven white) holding "B" certificates, who in fact had numerical NTE scores identical to or lower than the nine black teachers who were not retained because they had "C" certificates. In addition, three new "B" teachers were hired whose numerical NTE scores were lower than those of the nine "C" teachers who were not retained.
 
 
 8
 Other facts will be stated in the portion of the opinion to which they relate.
 
 II.
 
 9
 There should first be stated some general principles which are relevant to the decision of a case of this type.
 
 
 10
 From the facts, it is clear that the teachers were discharged as part of, or at least contemporaneously with, the transition from a formerly state-mandated dual system of schools to a unitary system. It is clear also that for the 1970-71 school year, the year scheduled for completion of the transition, as well as earlier years when the effect of Green v. New Kent County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), on defendants' freedom of choice plan became apparent, a disproportionately large number of black teachers were suddenly discharged. Our holdings in such circumstances require the School Board to demonstrate by clear and convincing evidence that the discharge of the teachers was not racially motivated; otherwise, they must be reinstated with back pay. Chambers v. Hendersonville City Board of Education, 364 F.2d 189, 192 (4 Cir. 1966); Wall v. Stanly County Board of Education, 378 F.2d 275 (4 Cir. 1967); North Carolina Teachers Association v. Asheboro City Board of Education, 393 F.2d 736 (4 Cir. 1968). These holdings have been approved in Keyes v. School District No. 1, Denver, Colo., 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). There, the Supreme Court described the sort of showing that it is necessary for the school authorities to make in such circumstances:
 
 
 11
 In discharging that burden [to justify the conduct of a school board by clear and convincing evidence], it is not enough, of course, that the school authorities rely upon some allegedly logical, racially neutral explanation for their actions. Their burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions.
 
 
 12
 93 S.Ct. at 2698. Defendants' good faith is an important factor, but it is not a determinative factor unless and until complete absence of racially discriminatory intent is also shown.
 
 
 13
 A second principle to be reckoned with is the holding in Griggs v. Duke Power Co., 401 U.S. 424, 431-432, 91 S.Ct. 849, 853-854, 28 L.Ed.2d 158 (1971), that
 
 
 14
 If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.
 
 
 
 * * *
 Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question.
 We followed this holding in Robinson v. Lorillard Corporation, 444 F.2d 791, 798 (4 Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971), and Moody v. Albemarle Paper Company, 474 F.2d 134, 138 (4 Cir. 1973). Griggs, Robinson and Moody dealt with initial employment and promotion, but the principle of those cases is equally applicable to the discharge of employees or the failure to reemploy. Of course, Griggs, Robinson and Moody were decided under Title VII of the Civil Rights Act of 1964 and the instant case arises under the fourteenth amendment. But it has been held, and we think correctly, that the test of validity under Title VII is not different from the test of validity under the fourteenth amendment. Castro v. Beecher, 459 F.2d 725, 732-733 (1 Cir. 1972); Western Addition Community v. Alioto, 340 F.Supp. 1351, 1353-1354 (N.D.Cal.1972); Davis v. Washington, 352 F.Supp. 187, 191 (D.D.C. 1972); Shield Club v. City of Cleveland, 5 FEP cases 566, 567 (N.D.Ohio 1973). See also Baker v. Columbus Municipal Separate School District, 462 F.2d 1112, 1114 (5 Cir. 1972); Chance v. Board of Examiners, 458 F.2d 1167, 1176 (2 Cir. 1972).[4]
 III.
 We turn to the application of these principles to the two facets of this case.
 The district court held that the School District had established by "clear and convincing evidence" that the failure to rehire Mrs. Funderburk and the nine "C" certificate teachers was not attributable to a racially discriminatory purpose.
 As to the nine "C" certificate teachers, the district court found that (1) the policy against rehiring "C" certificate teachers stemmed from a good faith effort to upgrade the quality of education within the School District; (2) such policy was non-discriminatory in its application; (3) the letter grade system of certification was based on NTE scores; and (4) performance on the NTE was "reasonably related" on the job performance as a teacher. These findings were held sufficient to satisfy the School District's burden of proof.
 As to Mrs. Funderburk, the district court based its conclusion on a total absence of affirmative evidence of a discriminatory motive on the part of the responsible District officials and certain evidence that Mrs. Funderburk was not rehired because of failure adequately to perform her duties in the past.
 We consider first the nine "C" certificate teachers and then Mrs. Funderburk.
 A. The briefs and oral argument of the United States and the amicus brief of The National Education Association and The South Carolina Education Association stress forcefully that the NTE examination on which the grade of the state certificate was based bore no "demonstrable" or "manifest" relationship to effective job performance as required by Griggs and that the failure to retain the nine "C" teachers must be invalidated for that reason.[5] The evidence on this issue was conflicting. The Superintendent of the system testified that in his opinion the NTE score reflected the preparedness of a teacher to do an effective job in the classroom. Dr. Deneen of the Educational Testing Service which devised and administers the NTE agreed that a teacher cannot teach what he does not know and that therefore the test results in the subjects tested on the NTE have significance, but he testified that the test was designed to be an "assessment of people who recently completed their education," that it was "designed for and normed on a college senior population," that it was not designed to measure knowledge acquired through teaching experience or in-service training, and that it was "not a fair measure of [the] . . . knowledge" of an inservice teacher in the subjects tested and "doesn't measure successfully anything for an in-service teacher . . .." While it recognized that NTE did not measure many desirable qualities of a teacher, the district court concluded that the test did measure a teacher's basic level of general knowledge necessary to be an effective teacher and therefore it was "not unreasonable" for the teacher certification grade to be used as the criterion for reemployment.
 Aside from recognizing that any test to determine whether to retain personnel, when application of the test has a disproportionate effect on identifiable racial groups, is valid under the fourteenth amendment only if it satisfies Griggs and its progeny, we take no position on whether NTE was validly used in the instant case.[6] It is unnecessary for us to pass upon this question because we are convinced that, even if the use of NTE scores themselves would have been valid, the policy not to retain "C" teachers was so inherently capricious in its application that it denied equal protection of the laws.
 The factual and legal basis of our conclusion may be simply stated. Only black teachers were discharged at a time when a unitary system of schools was yet to be achieved. There was uncontradicted evidence in the record to the effect that the system of letter certification did not provide for uniform correlation between letter certificates and underlying NTE scores for all teachers. Because the minimum NTE score required to obtain a "B" certificate had been raised prior to the issuance of the "C" certificates held by the nine black teachers not rehired, twenty-six "B" certificate teachers (fifteen black and eleven white) were rehired with NTE scores that would have qualified them for "C" or "D" certificates of later vintage. Stated otherwise, the twenty-six had as low or lower NTE numerical scores of not less than two of the nine who were not rehired. See Appendix A appended to this opinion. Based upon their NTE scores, these twenty-six "B" teachers should have been put in the same class as the nine black "C" teachers for purposes of the decision whether or not to rehire them. The resulting unevenness of application of the defendants' basic concept renders academic any discussion of the rationality of the standard being applied, including any discussion about the basis on which the validity of the standard turns, i.e., rational basis, compelling purpose, etc. See, e.g., Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). The School District has not satisfied its burden of proof under Chambers where it is established that a substantial number of white teachers, with NTE scores lower than those of the blacks that were let go, were retained.
 It is true that the district court found that the inconsistency created by the use of "C" grades rather than numerical scores was "unknown to defendants," apparently because of reluctance on the part of Educational Testing Service and the State certification officials to make this information available to the defendants. Its finding is not clearly erroneous and therefore the selection of the "C" grade as the standard to be used, in itself, supplies no basis on which to impugn defendants' good faith. But this does not validate defendants' actions.
 No State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be. It is of no consolation to an individual denied the equal protection of the laws that it was done in good faith.
 Burton v. Wilmington Park Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed. 2d 45 (1961). The Supreme Court has recently reemphasized that the discriminatory effect of a State action will render it invalid under the fourteenth amendment notwithstanding the absence of a discriminatory purpose.
 Thus, we have focused upon the effect -not the purpose or motivation-of a school board's action in determining whether it is a permissible method of dismantling a dual system. The existence of a permissible purpose cannot sustain an action that has an impermissible effect.
 Wright v. Emporia, 407 U.S. 451, 462, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51 (1972). See also Norwalk CORE v. Norwalk Redevelopment Agency, 395 F. 2d 920, 931 (2 Cir. 1968); Hawkins v. Town of Shaw, 461 F.2d 1171, 1173 (5 Cir. 1972).
 Since it is so obvious that persons similarly circumstanced have been treated unequally, we conclude that the nine "C" teachers must be granted relief.
 B. Mrs. Funderburk was the only black "B" teacher who was not reemployed. Seven white "B" teachers were also terminated. She had twentynine years of teaching experience, ten in the Chesterfield County schools, and she was recommended for reemployment by her principal. He, however, was also discharged for reasons reflecting on his professional competence; and in the opinion of the superintendent, the principal's recommendation was suspect. The school in which she had been teaching had a completely integrated faculty.
 The decision to terminate Mrs. Funderburk was made by the advisory council and was routinely ratified by the School Board. The advisory council made no record of the evidence it considered, but evidence of the basis on which it acted was adduced at the trial. The statement of the chairman of the council showed that Mrs. Funderburk was not recommended for reemployment for the school year 1969-70, but she was reemployed to fill a vacancy immediately prior to the opening of schools in 1969. During that year, the chairman observed her a number of times when school was in session and he found her class unattended and in disorder. A nurse at the school gave a statement that Mrs. Funderburk did not "preside" or "function" as a teacher but sat stoically at her desk with a bottle or glass of a cola drink. The head reading teacher at the school gave a statement that Mrs. Funderburk had no enthusiasm for in-service training in remedial reading and declined to implement any of the techniques which were taught. The successor principal of the school indicated that Mrs. Funderburk's effectiveness as a teacher had been the subject of question as early as the 1967-68 school year and that there had been further complaints in 1969-70. Finally, the superintendent testified that, although he did not observe her perform as a teacher, she was, in his opinion, "an incompetent teacher, and did not measure up to the qualifications desired of a teacher to be in a class room."
 The district court found that the failure to rehire Mrs. Funderburk was not a case of racial discrimination, and we think that this finding was not clearly erroneous. The district court's characterization that there was "not a shred of evidence to support" the charge that her dismissal was racially motivated impliedly suggests a possible misconception of defendants' burden of proof under Chambers and Keyes. Nonetheless, we think that his ultimate conclusion should stand. The proof, in addition to showing that there was a reasonable basis on which to conclude that she was an unsatisfactory teacher, irrespective of her color, negatived the possibility that the failure to reengage her, even though it occurred at the time of dismantling a dual system of schools, had any racial motivation. Mrs. Funderburk was not the only "B" teacher whose employment was not renewed; seven white "B" teachers were terminated also. While she was the only "B" teacher not reengaged whose principal recommended that she be retained, the significance of his recommendation was neutralized by the fact that he was not retained on grounds of professional incompetence. Therefore, we see no basis to treat her in a separate classification from the seven white "B" teachers. Prior to the decision not to retain her, the faculty of the school at which she taught had been integrated and her retention or discharge would have no significant effect on the faculty's racial balance. In short, we are impelled to the conclusion that her color was a fortuitous fact and not any part of the decision not to retain her.
 IV.
 As to Mrs. Funderburk, we affirm the decree of the district court. As to the nine "C" teachers, we reverse the decree of the district court and remand for further proceedings. On remand, the district court will order the reinstatement of the nine "C" teachers with back pay for any loss of earnings (less earnings from any actual or reasonably available employment), together with reinstatement of any accompanying lost benefits or privileges. We conclude that the government should recover its costs.
 Affirmed in part; reversed in part; and remanded.APPENDIX A
 The table set forth below was compiled from information contained in Government Exhibits Nos. 2 and 22.
 TEACHERS RETAINED & TEACHERS TERMINATED BY THE
 CHESTERFIELD COUNTY SCHOOL DISTRICT WHO
 SCORED BELOW 425 ON THE 1969-70-1970-71
-------------------------------------------------------------------------------
Name of Black Teachers Score of Score of Race of Teachers
 Terminated Black Teachers Retained
 Teachers Retained
 Terminated
---------------------- ------------ ---------------- -----------------------
 330 ....... White
 355 ....... White
 358 ....... Black
Freder J. Curry 359 360 ....... White*
 361 ....... Black
 361 ....... Black*
 363 ....... Black**
 365 ....... Black
 367 ....... White*
 367 ....... White
 369 ....... Black
 370 ....... Black
 373 ....... Black
 375 ....... Black
 378 ....... Black**
 378 ....... White
Eva McKay McDuffie 378 380 ....... Black
 382 ....... White
 383 ....... White
Margaret McCall Watson 383
Evelyn Louella James 384 385 ....... White
 385 ....... White
Rachel Stewart Evans 387
Helena Ruth Funderburk 389 389 ....... Black
Marian Shaw Funderburk 390 390 ....... White
 391 ....... Black
 396 ....... White
Neva McLaughlin 397 397 ....... Black
 Thompson
Anna Sanders Ellerbe 400 410 ....... Black**
 410 ....... White
 419 ....... Black
 420 ....... Black
 422 ....... Black
 424 ....... Black
 
 
 *
 Single asterisk indicates that the teacher was not employed in the school
 districtt in 1969-70, but was employed for 1970-71.
 
 
 **
 Double asterisk indicates that the teacher was employed in the school
 districtt in 1969-70, but was not employed for 1970-71.
 
 
 [1]
 These figures include the ten dismissals which are the subject of this appeal
 
 
 [2]
 The NTE consists of two parts: the common examination and the teaching area examination. South Carolina certificate grades are based solely on the former. That part tests professional education and general education
 
 
 [3]
 For example, a teacher who obtained a minimum score grade "B" certificate in the period 1954-57 would qualify for only a "D" grade certificate by current standards
 
 
 [4]
 The question of whether the standards of impermissible job discrimination are identical under both the fourteenth amendment and Title VII of the Civil Rights Act of 1964 has been largely rendered moot by statute for cases whose operative facts occurred after March 24, 1972. Effective as of that date, the Act was amended to apply directly to the conduct of State employers. 42 U.S.C.A. Sec. 2000e(b) (Supp.1973)
 
 
 [5]
 The record in this case provides no support for an assertion that the use of letter grades of better than "C" as the criterion for retention of teachers was necessarily racially discriminatory. For the years 1966-67, the last year in which statistics by numerical grades and race were kept, there were 26,382 teachers in the state system. Of these, 17,303 were white and 9,079, or 34.41%, were black. Teachers having a letter grade of "A" or "B" were 25,151 in number; and of these, 17,106 were white and 8,045, or 31.99%, were black. The 2.42% difference in racial distribution between those having a better than "C" grade and those not would appear insignificant
 
 
 [6]
 As stated in the text, the district court found that performance on the NTE was "reasonably related" to on-the-job competence. A subsidiary question may be raised as to whether such a finding is sufficient to validate the use of the test under the rule in Griggs which requires such tests to bear a "manifest" or "demonstrable" relation to job performance. While we do not decide whether a "reasonable" relation is the same as a "manifest" or "demonstrable" relation, the degree of proof of job-relatedness required by Griggs is an issue that may have to be confronted in future litigation of this type