**Annis J. CANNADY, Plaintiff,**

v.

**PERSON COUNTY BOARD OF EDUCATION et al., Defendants.**

**No. C–252–D–71.**

United States District Court,
M. D. North Carolina,
Durham Division.

March 27, 1974.

---

J. LeVonne Chambers, Charlotte, N. C., and Adam Stein, Chapel Hill, N. C., for plaintiff.

Richard G. Long, Roxboro, N. C., and Richard M. Hutson, II, Durham, N. C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

GORDON, Chief Judge.·

In this case the plaintiff seeks, under the provisions of 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 1983, the following relief:

1. A preliminary and permanent injunction enjoining the defendants from discriminating on the basis of race and color in the operation and administration of the Person County public schools.

2. An order that the plaintiff be reinstated in the same or comparable position held prior to her dismissal, with back pay and reimbursements for all expenses and losses incurred as a result of her dismissal.

3. An order awarding costs and reasonable attorney fees.

The case was heard by the Court sitting without a jury on August 20–21, 1973.

Having now carefully considered all of counsel's proposals, arguments and contentions, as well as the testimony, stipulations, briefs and exhibits submitted, and the reasonable inferences to be drawn therefrom, the Court pursuant to Rule 52 of the Federal Rules of Civil Procedure makes its Findings of Fact and Conclusions of Law.

### Findings of Fact

1. The plaintiff, Annis J. Cannady, filed this action on November 18, 1971, alleging that she was discharged by the Person County Board of Education as a teacher because of her race and color and that she was denied due process and equal protection of the law under the Fourteenth Amendment of the United States Constitution.

2. The plaintiff is a 49 year old black, female, elementary school teacher. Plaintiff received her Bachelor of Arts Degree from Shaw University, Raleigh,

North Carolina, in 1946. She has done graduate work in remedial reading at the University of California at Berkeley (1953), and more recently, in 1969, while renewing her teaching certificate. She studied nongraded team teaching at North Carolina Central University, Durham, North Carolina. Plaintiff holds a Class A Teacher's Certificate in elementary education from the State of North Carolina.

3. Plaintiff began her teaching career in Georgia in 1946, and remained there until 1952. Commencing in 1952, plaintiff was employed by the Person County Board of Education, continuously, until her employment was terminated at the completion of the 1970–71 school year.

4. From 1952 through the 1968–69 school year, the plaintiff taught at the Roxboro Elementary School, a school with an all black faculty and student body. The Person County School System became fully integrated in the 1969–70 school year at which time the name of Roxboro Elementary School was changed to South Elementary School.

5. At the beginning of the 1969–70 school year, the Person County Board of Education initiated and implemented, upon the recommendation of the North Carolina State Department of Public Instruction, a program at the elementary level providing for individualized instruction and team teaching. Individualized instruction means adapted instruction based on individual children's interests and tailoring instruction to fit the needs of the individual. It consists of providing alternatives to individuals in a group situation and accepting the responses of individuals to a common stimulus and not requiring all children to respond in the same way. Each child is placed in a small instructional group within his class in which he can make the most progress from level to level at his own rate. The grouping is flexible and may be changed whenever the need arises. Because regrouping is frequently necessary to satisfy the instructional needs of children, the need for team teaching arises.

Team teaching is a group of two or more teachers assuming the responsibility for the total instructional program for two or more classrooms of children. Each team groups their students in the manner in which they deem best. These teachers, complementing each others talents, have common responsibility for planning, fulfilling and evaluating the total education program for their students. A teacher who has a high degree of knowledge or skill in one area will instruct all students of the team. This allows the student to derive the maximum benefit from a teacher's strengths.

In a classroom employing individualized instruction, the students would be divided into several small groups working at different levels. The teachers would rotate among these groups and guide the instruction.

6. At the beginning of the 1969–70 school year, all teachers in the Person County School System were given a choice of assignment in view of the implementation of total integration, and team teaching and individualized instruction in some, but not all of the schools. The plaintiff chose to be assigned to South Elementary School where team teaching and individualized instruction were to be utilized. Prior to the opening of the 1969–70 school year, the entire faculty of South Elementary School participated in a one week training session. The training was directed towards instruction in the areas of scheduling, materials, techniques of team teaching, grouping and ways of individualizing instruction.

7. At South Elementary School, the plaintiff was assigned to a team teaching position in the fourth grade with Mrs. Nancy Wagstaff and Mrs. Francis Wilkins, both of whom were white. Within the first six weeks of the school year, Mrs. Wilkins requested and was granted a transfer to another school not utilizing team teaching and individualized instruction. The evidence indicates

that this transfer was made because of Mrs. Wilkins' inability to adjust to the team teaching techniques. Mrs. Wilkins' replacement in the team was Mrs. Greta Jeffers, who is black. The Wagstaff, Cannady, Jeffers team remained intact throughout the remainder of the 1969–70 school year. At the end of that year Mrs. Jeffers was promoted to Instruction Supervisor.

8. In the fall of 1969 difficulties began to arise in the team. The problems centered around plaintiff's lack of cooperation and seeming ambivalence to the entire team teaching concept. Both Mrs. Wagstaff and Mrs. Jeffers testified that the plaintiff was not cooperative and did not follow through on plans discussed and agreed upon in team meetings. Specifically, the plaintiff failed to meet her scheduled supervision for physical education, music and lunchroom as she had agreed with her team members. This failure did not happen occasionally but consistently, and eventually Mrs. Wagstaff and Mrs. Jeffers had to substitute in place of plaintiff. In addition to plaintiff's lack of cooperation vis-a-vis team teaching, plaintiff failed to implement individualized instruction. Both Mrs. Wagstaff and Mrs. Jeffers testified that they seldom, if ever, observed the plaintiff supervising individualized instruction, nor did she participate in the grouping of students.

9. Mrs. Jeffers and Mrs. Wagstaff eventually took their problems to Mr. Samuel Spencer, Principal of South Elementary School, and subsequently, in February or March of 1970, they met with Mr. Walter S. Rogers, Superintendent of the Person County Schools. Mr. Rogers requested that Dr. David W. Rogers, Associate Superintendent, and Mrs. Betty R. Stewart, Instruction Supervisor, go to the classroom, observe the plaintiff, and assist her in any manner they could.

10. Dr. Rogers visited the plaintiff in the classroom on several occasions thereafter. On each of these visits, Dr. Rogers observed that the plaintiff was not employing individualized group instruction and that many students did not appear to understand what they were doing. Dr. Rogers concluded that the plaintiff was not implementing individualized small group instruction; that there was a failure of student activity; that the instruction of the plaintiff was a surface treatment of the matters with little substance. Based upon his observation and conversations with the plaintiff, Dr. Rogers was of the opinion that the plaintiff was not competent to teach in the Person County Schools employing team teaching and individualized group instruction. These conclusions and opinions were reported to Superintendent Walter S. Rogers in the spring of 1970.

11. Mrs. Betty R. Stewart, Instruction Supervisor for the Person County Schools, also observed the plaintiff pursuant to Superintendent Roger's request. Mrs. Stewart was experienced in team teaching and individualized instruction, and had received training from the State Department of Public Instruction and attended several courses and lectures on the subject. Mrs. Stewart has been employed by the Person County School System for 22 years; 12 years as a classroom teacher, and 10 years as an Instruction Supervisor.

Mrs. Stewart testified that the plaintiff would not carry out or follow through with the plans of the team even though she participated in formulating them. On one occasion, Mrs. Stewart planned with the team to teach a science unit. It was agreed that Mrs. Wagstaff would be the lead teacher and Mrs. Stewart would be her aide. The plaintiff was to take one-half of the students to the library while the other half would stay for the instruction and on the next day, the students would reverse their positions. Schedules were carefully planned and worked out. On the day of the instruction, the class with nine group activities in progress had twenty minutes left when the plaintiff, in disregard of the plans, returned to the suite

with the rest of the class. This completely disrupted the class and the returning students class the next day was not as effective since it was partially a repeat of the activities. Throughout the school year, Mrs. Stewart never observed the plaintiff individualizing her instruction.

Mrs. Stewart testified that it was her opinion from her observations and attempts to work with the plaintiff that the plaintiff was not capable of teaching so as to comply with the policies and practices of the Person County Board of Education.

12. By the spring of 1970, Superintendent Walter S. Rogers was aware of his supervisor's evaluations and the problems encountered, and plaintiff was aware of the reports about her made by Mrs. Jeffers and Mrs. Wagstaff. At or near the end of the 1969–70 school year, Superintendent Rogers made the decision to transfer plaintiff to North Elementary School for the 1970–71 school year.

13. In contrast to South Elementary, North Elementary had a white principal, Mr. Stephen Edwin Knott, and a majority of white students. In the 1970–71 school year, all schools in Person County were individualizing instruction. In all elementary schools, at the fourth, fifth and sixth grade levels team teaching was practiced. Plaintiff was primarily a fifth and sixth grade teacher.

14. At North Elementary plaintiff was assigned to a team teaching position at a fifth grade level. In addition to plaintiff, the team included Mrs. Betty W. Moore and Mrs. Betty Webber. Neither the principal, Mr. Knott, nor the teachers comprising the team to which the plaintiff was assigned was aware of any problems the plaintiff had encountered the previous year at South Elementary School. None of these persons had seen any written report or received any oral communications from the superintendent or supervisors relating to the practices and teaching ability of the plaintiff.

15. In the fall of 1970, Mrs. Webber and Mrs. Moore began to experience a lack of cooperation by the plaintiff. On several occasions the plaintiff failed to follow the plans as agreed upon by the team members, which caused disruption in the instruction to the students. Mrs. Moore testified that the plaintiff failed to support and enforce the rules and regulations which had been agreed upon by the team members.

Mr. Knott, Principal, met with the team members on several occasions in the first part of the school year in an attempt to properly organize the team. He discussed and emphasized the importance of following through with plans and the unanimous enforcement of rules and regulations. Despite this repeated counseling, the plaintiff again did not follow the schedules for music, library and physical education.

The team used an open suite for the instruction of their classes and Mrs. Moore testified that she observed the plaintiff daily in her instruction throughout the school year and that the plaintiff did not implement individualized instruction. She failed to formulate any math or reading groups and Mrs. Moore did not observe any type of checking, testing or any other type of measurement of a student's progress.

16. In January, 1971, Mr. Knott requested that Mrs. Betty R. Stewart, Instruction Supervisor, observe the plaintiff and talk to her and the other team members. Mrs. Stewart observed the plaintiff several times and attempted to assist the plaintiff in implementing and coordinating individualized group instruction. On these occasions the plaintiff resisted individualized instruction and returned to the lecture approach. An example of such resistance occurred in March of 1971: Mrs. Stewart and Mrs. Jeffers, who had been promoted to Instruction Supervisor, spent an entire day in the suite setting up learning centers for small group instruction and working on multi-level language arts materials. The next day the plaintiff rearranged the classroom eliminating the

learning centers and returned the seating to straight rows to employ the lecture approach.

17. During the school year 1970–71, Mrs. Greta Jeffers, Instruction Supervisor, had several occasions to visit the classroom of the plaintiff at the request of Mr. Knott and Superintendent Rogers. Mrs. Jeffers also participated in several planning periods of the team members. During this time, she observed that the plaintiff would not engage and participate in team planning. Mrs. Jeffers noted that on her visits to the plaintiff's suite, the plaintiff failed to use individualized instruction. At no time did she observe the plaintiff working with small groups or move from behind her desk to give assistance to a student or group of students needing help.

Mrs. Jeffers testified that the plaintiff appeared to have a very negative attitude towards the team teaching concept of instruction. Mrs. Jeffers also testified that it is her opinion that the plaintiff is not a competent teacher to plan work and evaluate student activities jointly as a team member, nor is she competent in individualizing instruction in small groups.

18. During the spring semester of 1971, Mr. Knott, Principal, had several occasions to meet and discuss with plaintiff her teaching methods and her dwindling prospects for re-employment the following year.

(a) On February 12, 1971, Mr. Knott met with the entire team to discuss plaintiff's failure to abide by the rules and regulations agreed upon by the team. Plaintiff stated that she did not recall any rules being made, but if there had been any, she did not understand them.

(b) On February 26, 1971, Mr. Knott met again with plaintiff's team to discuss plaintiff's failure to enforce disciplinary rules.

(c) On March 12, 1971, Mr. Knott called plaintiff into his office and discussed her problems regarding planning and cooperating with the other teachers, and her failure to implement individualized instruction. At this meeting she was also warned that if her teaching methods did not improve, her evaluation would be very low and that she could possibly be replaced.

(d) On April 16, 1971, Mr. Knott again called in plaintiff to discuss her lack of progress in the areas previously mentioned. Mr. Knott again explained to her that he would have to give her a poor evaluation, and that this would mean that he would recommend that she not be rehired unless great improvement was made.

(e) On May 13, 1971, Mr. Knott again met with plaintiff and at this time showed her his written evaluation of her and advised her that it would be his recommendation that she not be rehired.[1] Plaintiff took exception to Mr. Knott's evaluation and asked to talk with Superintendent Rogers. Mr. Knott immediately arranged a meeting with Mr. Rogers for plaintiff that same day, and gave her a copy of his evaluation to take with her. Mr. Rogers called in both Dr. Rogers and Mr. Knott to discuss the evaluation with the plaintiff at that time. Mr. Rogers informed plaintiff that he agreed with Mr. Knott's evaluation and recommendation that her contract not be renewed. Mr. Rogers agreed to reconsider his decision, and it was decided that they should all meet again in a week.

(f) On May 20, 1971, the plaintiff, Mr. Knott and Superintendent Rogers met in Mr. Knott's office, at which time Mr. Rogers advised plaintiff that he still agreed with Mr. Knott's evaluation and that he would recommend to the Person County Board of Education that her teaching contract be terminated after the 1970–71 school year. Mr. Rogers also informed the plaintiff that she had a right to a hearing before the Board of Education, and the right to be represented by counsel at such hearing.

---

1. The written evaluation of plaintiff by Mr. Knott is Appendix A, *infra.*

19. The plaintiff did not request to be heard by the Board of Education, and on June 7, 1971, at its next regularly scheduled monthly meeting, the Board concurred in Mr. Roger's non-renewal decision. On June 8, 1971, Mr. Rogers notified the plaintiff by registered mail that her contract would not be renewed.

20. On July 29, 1971, the plaintiff contacted Mr. Rogers by telephone and requested a hearing before the Person County Board of Education. Mr. Rogers scheduled a hearing to be held on August 2, 1971. Later that same day, July 29, plaintiff again telephoned Mr. Rogers to inform him that her counsel could not make the August 2 date, and to request that the hearing be continued. No specific future date for a hearing was set at that time.

21. On August 9, 1971, Mr. J. LeVonne Chambers, Attorney at Law, wrote to Mr. Richard G. Long, Attorney at Law, who is now deceased, informing Mr. Long, as attorney for the Person County Board of Education, that he represented the plaintiff. Mr. Chambers also requested the reasons for plaintiff's termination and for the new date of the Board hearing. Mr. Rogers was notified by telephone by Mr. Long of this letter from Mr. Chambers.

22. On August 30, 1971, Mr. Chambers, having received no reply to his first letter, again wrote Mr. Long requesting a date for a Board hearing.

23. On August 31, 1971, Mr. Long, in response to Mr. Chambers second letter, wrote Mr. Chambers informing him that he, Long, felt that no useful purpose could be served by scheduling a new hearing. A copy of Mr. Long's letter to Mr. Chambers was sent to Mr. Rogers.

24. Sometime in late August or early September, 1971, the exact date being unknown, plaintiff contacted Mr. Rogers and requested a hearing before the Person County Board of Education. The exact conversation between Mr. Rogers and the plaintiff is in dispute. The plaintiff contends that Mr. Rogers conditioned granting of a hearing upon her assurance that she would not be represented by counsel. It is concluded that no such condition was expressly or implicitly made a prerequisite for obtaining the hearing. The plaintiff had no reason whatsoever to believe that she could not be represented by counsel. Indeed, the facts as set out in Finding Nos. 18(f) and 20 show that plaintiff was fully aware of her right to counsel at the Board hearing.

It is not disputed that in the course of this conversation between plaintiff and Mr. Rogers, plaintiff agreed to a hearing on September 7, 1971, and informed Mr. Rogers that she would not be represented by counsel.

25. On September 7, 1971, the plaintiff appeared before the Person County Board of Education. At the outset of the hearing Mr. Rogers and Mr. Long, Attorney for the Board, each told plaintiff that she was entitled to be represented by an attorney. The plaintiff replied that she would plead the case on her own.

26. All members of the Person County Board of Education were present on September 7, 1971, and in addition thereto, Mr. Walter S. Rogers, Dr. David Rogers and Mr. Richard G. Long. The plaintiff stated her grievances to the Board and the reasons why, in her opinion, her contract should not have been terminated. She further submitted for review to the Board certain work and materials some of which she had prepared and some that had been prepared by students under her supervision.

27. The Chairman of the Board of Education, Mr. Bradsher Gentry, called upon Superintendent Walter S. Rogers to review and explain the reasons for his decision not to renew the plaintiff's contract. In addition, Dr. David W. Rogers was also called upon, and he stated his observations and the reasons why he recommended that the plaintiff's contract be terminated. The Board, after hearing everything the plaintiff wanted to say, decided to sustain its earlier decision to terminate the plaintiff.

28. The Person County Board of Education consists of five persons: Mr. Bradsher Gentry, Chairman, Mrs. Emma N. Noell, Mr. Carl W. Forsyth, Mrs. Vera C. Dawes, and Mr. James E. Winslow. They are all white. No black has ever served on the Person County Board of Education.

29. Prior to the school year 1969–70, there were no complaints about the plaintiff to Superintendent Rogers.

30. There was no tenure available to public school teachers during the years of plaintiff's employment with defendant.[2] The contracted relations between the parties to this action were, at all relevant times, governed by and subject to North Carolina General Statute § 115–142, which reads in pertinent part:

"(b) All contracts, except contracts with superintendents and assistant superintendents, now or hereafter entered into between a county or city board of education and a teacher, principal, or other professional employee shall continue from year to year unless terminated as hereinafter set forth. When it shall have been determined by a county or city board of education that an employee is not to be retained for the next succeeding school year it shall be the duty of the county or city superintendent to notify the employee, by registered letter deposited in mails addressed to last known address or business address of employee prior to the close of the school year, of the termination of his contract."

31. The employment practices of the Person County Board of Education evidence no patterns or indications of racial discrimination.[3]

32. In the 1970–71 school year forty-one teachers left the employ of the Person County School System. Of this number, four teachers were asked to resign and one, plaintiff, did not have her contract renewed. There was some testimony by Superintendent Rogers that plaintiff was informed that she would be asked to resign, but that point was not clarified. Therefore, no finding as to whether or not plaintiff was first asked to resign or given the opportunity to do so before she was terminated is made. Of the four teachers asked to resign, three were white, and no information as to the fourth was furnished.

33. It is concluded that racial discrimination played no part in the decision to terminate plaintiff's contract with defendant.

## DISCUSSION

This action is brought pursuant to Title 28 U.S.C. § 1343(3) and (4) (1970) and authorized by Title 42 U.S.C. §§ 1983 and 1981 (1970) seeking redress for rights secured by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. All parties are properly before the Court and the Court has jurisdiction of the parties and the subject matter.

### I.

■ Plaintiff's first contention is that her race was a factor in the decision *not to renew her teaching contract* after the 1970–71 school year. Unquestionably, such an allegation, if true, would render void any action depriving her of employment with the Person County School System. However, the issue of racial motivation is a question of fact, and it has previously been found that plaintiff's race had absolutely no bearing upon her termination.

Plaintiff relies upon numerous, recent cases emphasizing the stringent burden the defendant must meet to show that racial discrimination was not a factor in school board decisions, and underscoring the great care with which the trial

2. This deficiency has now been remedied by the North Carolina General Assembly. Session Laws 1971, c. 883, effective July 1, 1972, codified as N.C.G.S. § 115–142.

3. See Appendix B, *infra.*

court must examine the facts to determine if that burden has been met.[4] It is concluded that the defendant, Person County School Board, has met the burden of demonstrating by clear and convincing evidence that the termination of Miss Cannady was not racially motivated.

Plaintiff's allegations of racial discrimination are simply not supported by any evidence.[5] On the contrary, much of plaintiff's own evidence proves to the satisfaction of the Court that race was not a factor in the decision not to renew her contract. Findings of Fact Nos. 31 and 32 [6] belie any notion that the Person County Board of Education is engaged in the type of racially discriminatory practices condemned in such cases as Chambers v. Hendersonville City Board of Education, 364 F.2d 189 (4th Cir. 1966), and United States v. Chesterfield County School District, 484 F.2d 70 (4th Cir. 1973). Moreover, the evidence of plaintiff's incompetence as a teacher is overwhelming and virtually uncontradicted. In this respect, the case at bar is not unlike the very recent case of Williams v. Hyde County Board of Education, 490 F.2d 1231 (4th Cir. 1974).

It is abundantly clear that Miss Cannady was released because she either refused or was unable to follow the teaching methods and philosophy required by the Person County Board of Education. Although team teaching and individualized instruction are relatively new concepts in public education in this country, they have been widely accepted and implemented. Certainly, the Person County School Board has the authority to require its teachers to follow these new methods and adhere to their precepts. Indeed, plaintiff does not argue to the contrary. It follows beyond cavil that the failure of a teacher to teach in the prescribed manner is sufficient cause for her release or dismissal.

That Miss Cannady was not teaching as she was required has been convincingly proven by the testimony of Dr. Rogers, Mrs. Stewart, Mrs. Wagstaff, Mrs. Moore, Mr. Knott and Mrs. Jeffers. Mrs. Jeffers' testimony is particularly probative in view of her extensive opportunities to observe plaintiff's work for nearly two years. Moreover, Mrs. Jeffers' testimony forcefully negatives any inference of racial discrimination since she, like Miss Cannady, is black.

II.

The second facet of plaintiff's attack upon the defendant's action is founded upon the Due Process Clause of the Fourteenth Amendment. Specifically, plaintiff contends that she was not afforded a hearing before the Board sufficient to comport with minimum standards of due process. To reach this issue now, however, is to put the cart before the horse, for this question can properly be addressed only after it has first been determined that the plaintiff was entitled to such due process.

A. The question of when a person is constitutionally entitled to a due process hearing before a governmental or administrative body which may take action adversely affecting him is one which has received considerable attention in recent years from the Supreme Court. [7] The specific question of a non-tenured teacher's right to a due process hearing prior

---

4. *See e. g.*, Keyes v. School District No. 1, Denver, Colo., 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); United States v. Chesterfield County School District, 484 F. 2d 70 (4th Cir. 1973).

5. Plaintiff introduced voluminous exhibits into evidence in an attempt to prove a pattern of racial discrimination in the Person County Schools, but an examination of these documents leads the Court to conclude that they simply do not support the allegation.

6. Finding of Fact No. 31 is based upon Plaintiff's Exhibit 1, Appendix B, and No. 32 is drawn from Plaintiff's Exhibit 10, (k) and (m).

7. *See e. g.*, Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), welfare benefits; Sniadach v. Family Finance Corp. of Bay View, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), prejudgment wage garnishment; Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), chattel repossession procedures.

to termination or non-renewal of a contract has not been neglected. In two landmark cases, Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L. Ed.2d 548 (1972) and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L. Ed.2d 570 (1972), the Supreme Court has mapped the course which we are obliged to follow.

In *Roth, supra,* the Court set out the "Black Letter Law" with which this Court must premise all further discussion.

> "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount." 408 U.S. at 569–570, 92 S.Ct. at 2705.

David Roth was hired as a teacher in a state college in 1968, for a fixed, one-year period. By state statute all new teachers were to be hired on yearly contracts for at least four years as a probationary period, after which they would be eligible for permanent or tenured employment. Roth's contract was not renewed after the first year had expired; he was given no reason for the decision, and no opportunity to contest it. The Court rejected Roth's plea that such a summary, unexplained termination violated fundamental principles of due process absent a showing that some constitutionally cognizable interest in liberty or property was adversely affected. Roth also contended that he was released in retaliation for his exercise of constitutionally protected free speech. The case was remanded to the District Court, in part, for a factual determination of that question.

In the case at bar, Miss Cannady, like David Roth, contends that she was released for a constitutionally impermissible reason—race. Having previously discussed and disposed of this contention as it relates to plaintiff's equal protection argument, concluding that race was

not a factor in defendant's action, it follows a fortiori that the allegation of racial discrimination will not support a conclusion that a due process hearing was required.

B. Eliminating the racial discrimination issue from the case does not, however, conclude the inquiry as to whether plaintiff was entitled to a due process hearing, for there are still two other paths leading to Fourteenth Amendment protection.

In *Roth, supra,* the Court gave considerable attention to the parameters of "liberty," guaranteed by the Fourteenth Amendment, as it relates to a non-tenured teacher's right to continued employment. "There might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated." *Roth, supra,* at 573, 92 S.Ct. at 2707. The Court then went on to itemize several categories of situations in which a nonrenewal of an employment contract could infringe the "liberty" of an individual. (1) Where one's interest in his good name, reputation, honor or integrity are called into question. (2) Where the employer by "declining to re-employ the [plaintiff], imposed on [her] a stigma or other disability that foreclosed [her] freedom to take advantage of other employment opportunities." *Roth, supra,* at 573, 92 S.Ct. at 2707. (3) Where denial of re-employment is punishment for the exercise of a constitutionally protected liberty such as speech or religion. But the Court concluded that "[i]t stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." *Roth, supra,* at 575, 92 S.Ct. at 2708.

■ Plaintiff alleges no charge or statement by defendant which would call into question her good name, reputation, honor or integrity, and indeed, there is no evidence to suggest anything of the sort.[8] Similarly, plaintiff does not

---

8. See defendant's written teacher evaluation of plaintiff, Appendix A, *infra,* wherein her

character (general conduct, ethics, morals) were indicated to be above average.

claim any restraint on a guaranteed fundamental liberty such as freedom of speech or religion.[9] A more difficult question is whether defendant's refusal to re-employ plaintiff after nineteen years of continuous and satisfactory employment imposed a stigma or other disability sufficient to rise to the magnitude of a protected interest in liberty.

In Johnson v. Fraley, 470 F.2d 179 (4th Cir. 1972), the Fourth Circuit Court of Appeals dealt with the nonrenewal of a non-tenured teacher who had been employed for twenty-nine consecutive years by the defendant school board. In the course of discussing the effect of the appellant's longevity of employment in relation to *Roth* and *Sindermann, supra,* Bryan, J., made the following observation for a Court divided on this point.

"In this canvass, we find *Sindermann* and *Roth, supra,* both declaring that injury to professional reputation or livelihood caused by an abrupt termination of an engagement of substantial longevity warrants an inquiry upon whether the means pursued satisfied constitutional due process. These decisions avouch that continuous employment over a significant period of time—such as appellant's 29 years—can amount to the equivalent of tenure. When it does, dissolution of the relationship requires prior 'notice and an opportunity to be heard', or else due process is wanting. Hence, because of her long school connection and the failure of the Board and Superintendent, acting as State representatives, to accord appellant due process, Evelyn Johnson's charges could rise to 14th Amendment magnitude." 470 F.2d at 181.

Understandably, plaintiff relies heavily upon *Fraley* and this language in particular. However, I am of the opinion that *Fraley* does not go so far as to hold that longevity of employment, per se, raises a presumption of an infringement of "liberty." Appellant, Johnson, in the *Fraley* case had suffered a summary judgment at the District Court, and the Court of Appeals held merely that she had stated a cause of action under the Fourteenth Amendment's Due Process Clause. *Fraley, supra,* at 183. Moreover, it is difficult to determine whether the language quoted above was in reference entirely to appellant's "liberty" interest or, in part at least, to her "property" interest.

The Supreme Court in *Roth, supra,* addressed this precise issue in a lengthy footnote concluding that some evidence of a stigma or other disability must be shown to establish a deprivation of "liberty." *Roth, supra,* 408 U.S. at 574, n. 13, 92 S.Ct. 2701.

"But even assuming, *arguendo,* that such a 'substantial adverse effect' under these circumstances would constitute a state imposed restriction on liberty, the record contains no support for these assumptions. There is no suggestion of how nonretention might affect the respondent's future employment prospects. Mere proof, for example, that his record of nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'" 408 U.S. at 574, n. 13, 92 S.Ct. at 2708.

In Kota v. Little, 473 F.2d 1, 3 (4th Cir. 1973), the Court of Appeals quoted with approval the following statement of Boreman, J., concurring specially, in the *Fraley* decision.

"To sufficiently state a constitutional claim of denial of 'liberty,' a nontenured teacher whose contract has not been renewed must plead either that his 'good name, reputation, honor or integrity' has been damaged by, in addition to the nonrenewal, . . . the assignment of reasons for the nonrenewal, which foreclosed his freedom to take advantage of other employment opportunities." Johnson v. Fraley, 470 F.2d at 185, (Boreman, J., concurring specially).

9. To the extent that the racial discrimination allegation may analytically come within this category, it has already been disposed of by the Court's Findings of Fact.

Careful study of *Roth, Fraley* and *Little, supra,* leads to the conclusion that plaintiff has failed to show the requisite stigma or other disability sufficient to elevate her claim to one of deprivation of liberty. This conclusion is reenforced by the Court of Appeals for the Fourth Circuit's most recent decision in this area, Williams v. Hyde County Board of Education, *supra.*

C. In Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Supreme Court made it clear that although non-tenured, a public school teacher could acquire a property interest in his future or continued employment sufficient to justify due process protection. We turn now to a discussion of plaintiff's possible property interest; the last remaining road to the beneficent protection of the Fourteenth Amendment's Due Process Clause.

*Sindermann, supra,* involved a state college teacher in Texas who was released without notice, explanation or a hearing after the conclusion of the fourth of four one-year contracts. Sindermann had taught at a junior college which was not subject to any official or statutory tenure system. In addition to a contention that he had been denied reemployment in reprisal for public criticism of the college administration, Sindermann also argued that he had a "property" interest in continued employment sufficient to require Fourteenth Amendment Due Process protection. The Court held that even without tenure Sindermann may have such a property interest. This is so because " '[p]roperty' interests subject to procedural due process protection are not limited by a few rigid, technical forms.

Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' . . . A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and he may invoke at a hearing." *Sindermann, supra,* at 601, 92 S.Ct. at 2699. Discussing Sindermann's position specifically, the Court said, "[a] teacher, like the respondent, who has held his position for a number of years, might be able to show *from the circumstances of this service —and from other relevant facts*—that he has a legitimate claim of entitlement to job tenure." *Sindermann, supra,* at 602, 92 S.Ct. at 2700 (emphasis added).

■■ In addition to explicit statutory tenure authority, a teacher may acquire the necessary property interest by express contractual provision or implied contractual obligations arising out of the circumstances surrounding the past employment relations. *Sindermann, supra,* at 602, 92 S.Ct. 2694, accord, *Roth, supra,* 408 U.S. at 576–578, 92 S.Ct. 2701. Careful analysis of the *Roth* and *Sindermann* cases requires the conclusion that plaintiff has failed to show the type of additional "relevant facts" from which the Court could imply a legitimate claim of job tenure.

North Carolina General Statutes § 115–142(b) [10] makes it clear that statutory law furnishes no source for implying tenure. The North Carolina Supreme Court has left little room for doubt that the statute may not be construed to allow implied tenure. *See* Still v. Lance, 279 N.C. 254, 182 S.E.2d 403 (1971).[11] Similarly, the plaintiff's con-

---

10. Set out in Finding of Fact No. 29, *supra.*

11. The strong relationship between state law and the implication of a property right is well illustrated by a footnote in the *Sindermann* opinion.

"We do not now hold that the respondent has any such legitimate claim of entitlement to job tenure. For '[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem

from an independent source such as state law. . . .' If it is the law of Texas that a teacher . . . has no contractual or other claim to job tenure, the respondent's claim would be defeated." 408 U.S. at 602, n. 7, 92 S.Ct. at 2700 (citation omitted).

In Still v. Lance, *supra,* the Court held that N.C.G.S. § 115–142(b) invested local school boards with virtually unreviewable discretion to terminate teacher employment contracts without notice or a hearing.

tract of employment furnishes no suggestion or ambiguity from which the Court could imply a legitimate entitlement to tenure.[12]

Plaintiff relies upon two recent, post *Roth-Sindermann*, decisions in which the possibility of implied tenure rights have been recognized. Johnson v. Fraley, *supra*, and Thomas v. Ward, 374 F.Supp. 206 (M.D.N.C.1974). An examination of these cases, as well as *Sindermann* itself, reveals that in each case some official school policy,[13] teacher's handbook,[14] or school board regulation[15] existed, which, when considered together with continuous satisfactory service over an extended number of years might justify the implication of a sufficient property interest despite lack of tenure.[16] All three cases concerned summary judgment motions, prior to trial, and prior to the introduction of all the evidence. The present case has been tried, and no additional relevant facts have been shown which would allow it to conclude that plaintiff had more than a mere unilateral expectancy of re-employment. The importance of being able to show some additional facts from the conduct or policies of the defendant school board is well illustrated by Kota v. Little, *supra*, a case very much like the matter now before the Court.

> "The district court concluded, and we agree, that nothing in the conduct or policies of the Pembroke authorities created any obligation of an expectation of employment. While the 'absence of such an explicit contractual provision [tenure] may not always foreclose the possibility that a teacher has a 'property' interest in re-employment,' a mere subjective expectancy on the part of a teacher is not a property interest within the meaning of the Fourteenth Amendment." 473 F.2d at 3 (citations omitted.)

Indeed, in light of the Findings of Fact in this case, *supra*, it stretches credibility to assume that plaintiff had even a subjective expectancy of re-employment. Over a period spanning two school years plaintiff was confronted with complaints about her teaching performance by four co-teachers, at least two instruction supervisors, at least one principal, the associate superintendent and the superintendent of the defendant school system. Certainly the plaintiff was, or should have been, well aware of her increasingly tenuous grip on continued employment with defendant.

For all of the foregoing reasons, it is concluded that the plaintiff, having no interest encompassed by the Fourteenth Amendment, was not entitled to a hearing meeting the minimum standards of procedural due process. Having thus righted the cart and the horse, it appears that a discussion of whether the hearing plaintiff eventually received satisfied such standards would be an unnecessary expense of energy. Nevertheless, in the event of an appeal, alternatively, it is concluded that the hearing before the Person County Board of Education on September 7, 1971, afforded the plaintiff due process rights.

*Conclusions of Law*

1. This Court has jurisdiction over the parties and subject matter of this action.

2. Plaintiff's race was not a factor in the decision of the defendant not to renew her employment contract.

3. Plaintiff's employment with defendant was terminated for just and sufficient cause.

4. Termination of plaintiff's employment by defendant did not constitute an

12. The contract is set out in Appendix C, *infra*.

13. Perry v. Sindermann, *supra*.

14. Thomas v. Ward, *supra*.

15. Johnson v. Fraley, *supra*.

16. In *Sindermann*, the Court indicated that the existence of rules, regulations, policies, practices, or customs, although unofficial and unwritten, might, nevertheless, justify the finding of a "common law" tenure. 408 U.S. at 602, 92 S.Ct. 2694. The evidence in the present case, however, does not permit such a finding.

**702**

infringement of plaintiff's liberty sufficient to invoke the Due Process Clause of the Fourteenth Amendment.

5. Termination of plaintiff's employment by defendant did not constitute an infringement of any property interest of the plaintiff sufficient to invoke the Due Process Clause of the Fourteenth Amendment.

Accordingly, counsel for the defendants will forthwith prepare and present a proposed judgment.

APPENDIX A

## TEACHER EVALUATION SHEET

DEFENDANT'S EXHIBIT

| Please Check | Poor | Fair | Average | Above Average | Excellent |
|---|---|---|---|---|---|
| 1. Character (General conduct, ethics, morals) | | | | X | |
| 2. Personal appearance (Dress, grooming) | | | | X | |
| 3. Personality | | | X | | |
| 4. Tact and Self-control | | | X | | |
| 5. General culture | | | X | | |
| 6. Enthusiasm | | X | | | |
| 7. Technique of teaching | X | | | | |
| 8. Classroom management | X | | | | |
| 9. Understanding of children | | X | | | |
| 10. Promptness & thoroughness | | | X | | |
| 11. Professional attitude | | | X | | |
| 12. Loyalty and cooperation | | | X | | |
| 13. Knowledge of subject matter | X | | | | |

Opportunities for observing the candidate _____

Length of employment under your supervision *One year*

Do you know of anything that would make the candidate unfit for strong work in this position? *Miss Cassidy cannot work with a team, her classroom*

General comments: *Management is very weak, also in my judgment, her teaching techniques are very weak.*

Date *5-13-71* Signature *S. Edwin Knott*

Title *Principal North Elementary*

## APPENDIX B

PERSON COUNTY BOARD OF EDUCATION

### 1968-69

| | White | Negro |
|---|---|---|
| Teachers | 182 | 93 |
| Principals | 11 | 5 |
| Assistant Principals | 1 | 1 |
| Elementary Supervisor | 1 | 1 |
| | 195 | 100 |

### 1969-70

| | White | Negro |
|---|---|---|
| Teachers | 178 | 92 |
| Principals | 8 | 5 |
| Assistant Principals | 3 | 1 |
| Elementary Supervisor | 1 | 1 |
| Art Supervisor | 1 | – |
| | 191 | 98 |

(Three white principals were demoted this year and placed under supervision of Negro principals)

### 1970-71

| | White | Negro |
|---|---|---|
| Teachers | 193 | 90 |
| Principals | 6 | 5 |
| Assistant Principals | 4 | 2 |
| Elementary Supervisor | 1 | 1 |
| Art Supervisor | 1 | 0 |
| | 205 | 98 |

HOFLER, MOUNT, WHITE & LONG ATTORNEYS AT LAW DURHAM, NORTH CAROLINA

1971-72

| | White | Negro |
|---|---|---|
| Teachers | 199 | 91 |
| Principals | 6 | 5 |
| Assistant Principals | 4 | 2 |
| Elementary Supervisor | 1 | 1 |
| Art Supervisor | - | 1 |
| | 210 | 100 |

APPENDIX C

4-25-67—150M

## CONTRACT FOR PROFESSIONAL SERVICE

### NORTH CAROLINA PUBLIC SCHOOLS

DEFENDANT'S EXHIBIT

*STATE OF NORTH CAROLINA,*

.. PERSON ................ *COUNTY*

THIS AGREEMENT entered into between the Board of Education of the ___Person County___

School Administrative Unit and ___Annis J. Cannady___ , who now holds,
(Name as it appears on back of certificate)

or is entitled to hold, a North Carolina ___Grammar A___ Certificate, No. ___432623___ ,
(Kind of certificate)

now in force, in accordance with and subject to the provisions of the school law applicable thereto, which are hereby made a part of this contract, WITNESSETH:

That said certificated person, having been duly elected to perform professional services in the public schools of said school administrative unit, subject to any special conditions set forth below, agrees to discharge faithfully all the duties imposed on such persons by the Laws of North Carolina and by the rules and regulations of the Board of Education of said school administrative unit.

That, in consideration of this agreement, said Board of Education promises to pay the above-named person for services rendered during the life of this contract the sum to which he is entitled according to the State Salary Schedule plus the local supplement, if any, applicable thereto, with State-supported positions being subject to the allotment of personnel by the State Board of Education and subject to the condition that the amount paid from State funds shall be within the allotment of funds made to said administrative unit for salaries, and with federal and locally-supported positions being subject to the availability of federal and local funds, and subject further to the condition that when the position for

which the employee is employed, whether a State, federal, or locally-supported position, is terminated this contract shall be terminated.

That assignments to duties will be made by the superintendent of schools.

That said Board of Education has authorized, in a regular or in a called meeting, its Secretary to execute this contract.

Special conditions: _____

_____

*Annie J. Connady*
(Employee)

*126 Johnson St. Roxboro*
(Employee's address)

*5-16-67*
(Date)

PERSON COUNTY _____ Board of Education

By _____ , Secretary

MAY 25, 1967
(Date)

NOTE: This form shall be used in the employment of all professional employees, as defined in G.S. 115-112. A copy of this contract shall be kept on file in the office of the superintendent and a copy furnished the employee.