**Laurence D. WINSTON, Sr., Plaintiff,**

v.

**SMITHSONIAN SCIENCE INFORMATION EXCHANGE, INC., et al., Defendants.**

**Civ. A. No. 75–2118.**

United States District Court,
District of Columbia,
Civil Division.

Sept. 7, 1977.

Frederic Rogers Kellogg, June D. W. Ka-lijarvi, Washington, D. C., for plaintiff.

William A. Carey, Richard A. Gladstone, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

*Findings of Fact*

I. *History of the Proceedings.*

1. This action, filed December 18, 1975, charged the Smithsonian Science Information Exchange (sometimes hereafter "SSIE" or the "Exchange") and its president, Dr. David F. Hersey (hereafter "Hersey"), with employment discrimination against blacks and other minority groups in violation of 42 U.S.C. §§ 1981 and 1983, 42 U.S.C. §§ 2000e *et seq.*, and the Fourteenth Amendment. (Compl. ¶ 1).

2. The case was brought as a class action by Laurence D. Winston, Thurmus E. King, Julian Anthony Adams, and Tyler Stevens Gates (hereafter "Winston," "King," "Adams," and "Gates"). (Compl. ¶¶ 1, 4–7, 10).

3. Defendants answered on February 17, 1976, and denied the essential allegations of the complaint. In particular, the defend-

ants contended that the action was not appropriate for class action certification and that the claims, if any, of the plaintiffs were time-barred. (Ans. ¶¶ 3–4). Thereafter the parties conducted extensive discovery.

4. By Order dated March 23, 1977, the Court granted defendants' motion for partial summary judgment and dismissed from the case King, Adams, and Gates on the ground that their asserted claims were time-barred.

5. On March 25, 1977, the Court issued its Order and Memorandum Opinion denying class certification.

6. Trial commenced on June 8, 1977, and concluded on June 15, 1977. Winston called ten witnesses, including himself, and introduced 70 exhibits. The defendants called ten witnesses and introduced 53 exhibits. Although the trial dealt only with Winston's own claims of racial discrimination, he was not so limited in his proof but was allowed to introduce evidence of the alleged class discrimination as evidence to support his individual claim.

II. *The Parties.*

7. Plaintiff Laurence D. Winston, Sr. is a black male, age 33, married with three children. After graduation from high school in 1961, Winston spent four years in the United States Air Force, during which he was trained as an air policeman and commercial transportation specialist and studied psychology at the University of New Mexico. He received an honorable discharge and came to work for the Exchange on October 18, 1965, as a GS–2 file clerk. (Winston Tr. 14–16, 28).

8. After just under nine years at the Exchange, during which he worked in the file room, the supply room, and the Office of the President, Winston was asked to resign or be fired in August 1974. From May 23, 1974 on, Winston had a pending employment discrimination complaint. He resigned on August 21, 1974. (Winston Tr. 28–29, 118–19).

9. While at the Exchange, Winston took courses in records management at the Department of Agriculture, commercial art at Columbia Technical Institute, and was studying business administration part time at Prince George's Community College at the time of his resignation. He has been attending Prince George's continuously since 1973. (Winston Tr. 15). When he came to the Exchange, Winston had no supervisory experience and no college degree or college credits.

10. The Smithsonian Science Information Exchange is a national repository for scientific research data. It originated in 1949 as the Medical Sciences Information Exchange, funded by six government agencies. In 1953 it became the Biosciences Information Exchange and came under the aegis of the Smithsonian Institution. It became the Science Information Exchange in 1960, and in 1971 was incorporated as a private non-profit corporation under the laws of the District of Columbia and renamed the Smithsonian Science Information Exchange. (Winston Tr. 17; Hersey Tr. 440–41; DX 37).

11. The Exchange appears as a line item on the annual Smithsonian Institution federal budget, from which it receives approximately 60% of its revenues. The remaining 40% is derived from user fees, of which the majority comes from agencies, grants or contracts. (Hersey Tr. 440, 517–19; DX 37; PX 63[1]).

12. Since its inception, SSIE has existed as a private corporation comprised of private-roll employees. It presently consists of just under 100 employees, a total which was just under 150 in 1964 and has gradually decreased over the years since 1964. (DX 9–11).

13. Accompanying this development has been the increasingly advanced automation of the Exchange's data-processing operations. (Winston Tr. 18–23; PX 1–6; DX 35–37).

1. Offered but not admitted into evidence; however, this is the entire General Accounting Office Report of which DX 37 is an excerpt.

14. Approximately one third of the Exchange's employees are research data analysts trained in various scientific disciplines. The remainder are non-professional employees in the Data Processing Division and the Office of the President. Before incorporation in 1971 the Office of the President was the Office of the Director. Before 1968 the Data Processing Division was known as the Operations Division and other related units. (Winston Tr. 18–24; DX 9–11).

15. The employees in the Data Processing Division and Office of the President, and their predecessors, are the so-called "nonprofessional" employees referred to in this proceeding. (Winston Tr. 20; Compl. ¶ 12).

16. The majority of nonprofessionals from 1964 to the present have been employed in the Data Processing Division, as it is now known, which has generally been divided into four or five branches, and the larger branches (such as Reports, Registry, Input Services) have generally been divided into two or more sections. (DX 8–10).

17. Defendant Hersey, since January 1972, has been the President of SSIE.

III. *The Evidence.*

18. In September 1965, Winston applied to SSIE for employment as a file clerk, having been referred to SSIE by the United States Employment Service. (Tr. 16; Winston Dep. 509).

19. On or about October 18, 1965, Winston was hired as a file clerk at grade 2, step 1—the position for which he applied. (Tr. 23, 28; Winston Dep. 509). His starting salary was $3,680 per year. (DX 53 # 213).

20. His employment by SSIE was Winston's first significant full-time civilian employment. Earlier he had been employed by National Car Rental Company from about August 5 to August 30, 1965, following his discharge from the Air Force.

21. Upon his employment by SSIE Winston was assigned to the file section under the supervision of Zeta Offutt [2] (hereinafter Offutt) where he remained until about January 1966, at which time he was transferred to the supply room. (Tr. 23–24, 27, 104; Winston Dep. 512).

22. Effective October 23, 1966, Winston received a step increase from grade 2/1 to 2/2, increasing his salary from $3,925 to $4,058. (DX 53 # 213).

23. Effective November 6, 1966, following a request from Evelyn N. Roll, the officer responsible for processing papers for personnel action (hereafter "Roll"), Winston received a promotion to grade 3, step 2, with an accompanying salary increase from $4,058 to $4,412 per year. (Tr. 28–29; PX 7–8; DX 53 # 213).

24. Effective November 5, 1967, Winston received a within-grade step increase from 3/2 to 3/3, increasing his yearly salary from $4,615 to $4,764. (DX 53, # 213).

25. Effective March 24, 1968, following another request by Roll, Winston received a promotion to grade 4, step 2, increasing his yearly salary from $4,764 to $5,161. (PX 9–10; DX 53 # 213).

26. During the fall of 1968 a number of SSIE employees, including Winston, received notices that their employment by SSIE would be terminated pursuant to a reduction in force necessitated by a lack of funds. (Tr. 31). On about December 9, 1968, Winston's termination notice was rescinded, and he continued in SSIE's employ without any loss or reduction in pay. (Tr. 31; DX 53 # 213). It was at about this time that Winston was assigned to the front office to assist with SSIE's new charge system under the supervision of Vincent Verfuerth (hereafter "Verfuerth"), SSIE's Executive Officer. (Tr. 32, 41).

27. While under the supervision of Verfuerth, Winston assisted in the preparation of an "operations manual" concerning SSIE's user charge system. (Tr. 32). Most of the documents contained in the manual

---

**2.** Ms. Offutt's married name is now Allen. (Tr. 868). For purposes of clarity we refer to her in these findings as Offutt. Ms. Offutt is black. (Tr. 166). She was employed by SSIE in 1961 and became manager of the Customer Services Division in March 1976. (DX 53).

were not authored by Winston. (Tr. 126). Using his graphic art skills, Winston prepared diagrams of the charge system from sketches provided by others. (Tr. 123–25).

28. Effective March 23, 1969, Winston received a within-grade step increase from 4/2 to 4/3, increasing his yearly salary from $5,316 to $5,487. (DX 53 # 213).

29. Effective May 18, 1969, Winston was promoted to reports clerk, grade 5, step 2, increasing his annual salary to $5,924. (Tr. 37; PX 11; DX 53 # 213).

30. Effective May 17, 1970, Winston received a within-grade step increase from 5/2 to 5/3, increasing his annual salary from $6,766 to $6,984. (DX 53 # 213).

31. On October 4, 1970, at the recommendation of Verfuerth, Winston received a within-grade quality increase from 5/3 to 5/4, increasing his annual salary to $7,202. (PX 14; DX 53 # 213).

32. During 1969 and 1970 Winston had expressed his belief to Verfuerth and Roll that his job title was inaccurate. (Tr. 41–43).

33. During about the same period Winston had conversations with Hersey concerning SSIE's shift to a user charge system, whether Hersey anticipated that SSIE would grow and increase its business, and Winston's chances for growth and additional responsibilities. (Tr. 444). Hersey's response was that while it was difficult to tell how fast SSIE would grow, he was confident that it would and that to the extent SSIE grew the employees who performed well would have an opportunity to grow with it. (Tr. 444–45, 486). Hersey told Winston he hoped Winston could be part of SSIE's growth. (Tr. 129–31).

34. From the time Hersey joined SSIE in 1961 to the present, Hersey has adhered to an open-door policy—that is, he has made it clear to SSIE's employees that they were free to see him at any time about anything, whether it be about a personal or a business matter. (Tr. 135–36, 445, 525).

35. When in January 1972 Hersey became President of SSIE, he initiated monthly staff meetings which were an encouragement to Winston and other SSIE employees.

36. At about the same time, Winston participated in and delivered to Hersey an anonymous memorandum dated January 24, 1972, which inquired about organizational and personnel matters at SSIE. (Tr. 51–54; PX 20).

37. Effective May 14, 1972, Winston received a within-grade step increase from 5/4 to 5/5, increasing his yearly salary from $8,051 to $8,295. (DX 53 # 213).

38. In June 1972, following discussions with Smithsonian personnel, Winston prepared a position description which he believed accurately reflected his job. (Tr. 46–48; PX 16).

39. It was during early 1972 that Winston had first discussed with Hersey his belief that his job title was inaccurate. (Tr. 49).

40. On the morning of August 16, 1972, upon arriving at his office, Hersey found in the middle of his desk a memorandum addressed to him from "SSIE Employees" (hereafter the "August 16th memorandum"). (Tr. 446; PX 21). The memorandum, which had been prepared by Winston and six or seven other black employees (Tr. 57), was delivered to Hersey's desk and to the desks of each of SSIE's employees by Winston before working hours on August 16th. (Tr. 58, 135).

41. The August 16th memorandum, which also was attached as a part of the complaint in this case, made serious charges of racial discrimination against SSIE, characterizing unidentified SSIE representatives as racial bigots. (Tr. 133–37; PX 21). At no time—including the time the memorandum was prepared through the trial of this case—could Winston identify those persons which the August 16th memorandum refers to as racist bigots. (Tr. 133–37).

42. Of the seven black employees identified by Winston as having assisted in the preparation of the August 16th memorandum, only one, Elbert Corbett, was called as a witness. (Pl's Ans. to Int. 11(b) of Defs' First Set).

43. Corbett testified that during the entire period of his employment at SSIE from 1963 (Tr. 254) no one was fired for bringing to management's attention grievances such as those expressed in the August 16th memorandum. (Tr. 282). Corbett himself received two promotions subsequent to the August 16th memorandum, the second promotion (to supervisory computer operator) occurring in December 1973. (Tr. 305–06). Corbett earlier, in 1969, had returned to SSIE from the Army, at which time Paul Gallucci selected him to be a computer operator, for which position he was trained by SSIE. (Tr. 304).

44. Upon receipt of the August 16th memorandum Hersey did three things:

(1) Because he was irritated by what he believed to be untrue accusations in the memorandum and because the manner in which the memorandum was brought to his attention was not in accord with his open-door policy, he began removing the memorandum from the desks near his office. (Tr. 447–48). He immediately replaced the memorandum on advice of one of SSIE's senior scientists. (Tr. 447).

(2) He held a staff meeting of all employees at which he announced that his door was always open and invited anyone who wished to to meet with him about any problem they had. (Tr. 58–59).

(3) He sought the advice of Archie Grimmett (hereafter "Grimmett") of the Smithsonian EEO office as to how to deal with the memorandum and the issues raised in it. (Tr. 448–49).

45. Shortly after his meeting with Grimmett and pursuant to Winston's request, Hersey had a meeting with Winston and other black employees at which the August 16th memorandum and the matters raised in it were discussed. (Tr. 59–62, 138, 449–50). Also present were Smithsonian's personnel director and Grimmett. (Tr. 60, 137, 330). At this meeting Winston stated that calling him "Larry" rather than Mr. Winston was an example of discrimination by Hersey. (Tr. 450). A number of the employees present characterized Winston's remark as ridiculous, stating that they preferred being addressed by their first names. (Tr. 450).

46. As a result of this meeting:

(1) SSIE agreed to establish an upward mobility program if funds were available. (Tr. 330–31).

(2) An affirmative action plan was prepared for SSIE and posted. (Tr. 62, 132, 331–32).

(3) SSIE appointed an EEO officer. (Tr. 331–32).

47. Hersey did not learn that Winston had participated in the preparation of the August 16th memorandum until after the institution of the present litigation. (Tr. 449).

48. In the fall of 1972, Hersey transferred that part of SSIE's operations which dealt with the collection of user income from Verfuerth to David W. Lakamp (hereinafter "Lakamp"), while at the same time giving Verfuerth additional responsibilities in connection with the procurement of input from federal agencies. (Tr. 451). Because Winston had been assisting Verfuerth in the collection of user income, the transfer of this operation to Lakamp meant that the supervision of Winston also was transferred from Verfuerth to Lakamp. (Tr. 451–52; 624).

49. This transfer of functions to Lakamp was based upon Hersey's decision that the responsibility for the collection of user income should be vested in SSIE's chief financial officer, who at that time was Lakamp. (Tr. 451). While the effect of this transfer of functions was to place Winston under Lakamp's supervision, Hersey's decision was solely a business judgment and was not racially motivated nor was the decision in any way influenced by Winston's opposition to alleged discriminatory practices. (Tr. 462).

50. The responsibility for Winston's supervision resided in Lakamp from the fall of 1972 until Winston left the employ of SSIE. (Tr. 624–25; 667). Winston was under Lakamp's direct supervision until May 1974. (Tr. 625). From May 1974 until

Winston left SSIE, Lakamp was familiar with Winston's activities. (Tr. 625).

51. In the fall of 1972 Lakamp had an initial meeting with Winston concerning the functions he was performing and the guidelines for Lakamp's supervision and evaluation of him. (Tr. 626–28; 667–68). At this meeting Lakamp told Winston:

(1) The critical factor in Lakamp's evaluation of him would be that Winston's responsibilities be carried out efficiently and accurately with a minimum of supervision. (Tr. 627; DX 2, p. 1).

(2) He would recommend without question that Winston receive a promotion and a new job description with the title customer services coordinator which Winston had been seeking from his former supervisor. (Tr. 627–28; DX 2, p. 1).

(3) To the extent possible, those parts of Winston's responsibilities which were largely clerical in nature would be removed and replaced with larger responsibilities designed to lead to opportunities for formal training and further promotion. (Tr. 627–28; DX 2, p. 1).

When Winston expressed concern at this meeting about his work reputation at SSIE, Lakamp told him that as far as he was concerned they were starting with a clean slate. (Tr. 627).

52. The guidelines for the supervision and evaluation of Winston which Lakamp set forth in his initial meeting with Winston were established in consultation with him. (Tr. 627–28; DX 2, p. 1).

53. On about October 11, 1972, Lakamp recommended that Winston be promoted to a grade 6, step 4, increasing his yearly salary to $8,969, with a new job description and the title customer services coordinator. (Tr. 628; PX 25B). This is the promotion and job description which Lakamp and Winston had previously discussed and which Winston had requested. (Tr. 627–28; DX 2, p. 1).

54. This job description and promotion was reviewed with Winston (DX 2, p. 1), approved by Hersey in October or November 1972 (Tr. 450–51; PX 25B), and became effective December 24, 1972. (DX 2, p. 1, DX 53 # 213). Hersey and Lakamp told Winston that if he performed his current duties satisfactorily there was an opportunity for him to grow at SSIE. (Tr. 476–77).

55. Thereafter, the following clerical functions for which Winston was responsible (PX 25B) were, over a period of time, either removed or largely compensated for by providing additional part-time administrative and clerical assistance in:

(1) Logging requests out of SSIE.

(2) Packaging out-going requests in SSIE search packages.

(3) Typing invoices and address labels.

(4) Maintaining customer files. (DX 2, p. 1).

Concurrently, new responsibilities were given to Winston (PX 25B; DX 2, p. 2), and funds were set aside for a training program for Winston. (DX 2, p. 2). Winston had first asked for special training in August 1972. (Tr. 143–44).

56. At the time Lakamp became Winston's supervisor and recommended him for promotion, he did not associate Winston with any complaints of racial discrimination at SSIE. (Tr. 628–29). Lakamp had seen the August 16th memorandum to Hersey, but it had gone completely out of his mind by the time he became Winston's supervisor and recommended him for promotion. (Tr. 628–30). There was no connection in Lakamp's mind between the August 16th memorandum and Winston, and Lakamp never associated the two until this litigation began. (Tr. 668).

57. On numerous occasions during the period from the end of 1972 to December 1973 Lakamp met with Winston to counsel him concerning his job performance. (Tr. 631; DX 2, p. 3). These meetings were precipitated by complaints from staff people about Winston's job performance. (Tr. 631). For example, Lakamp received complaints from scientists that Winston either could not be found or was not responding to their particular needs. (Tr. 631–32).

58. On more than two occasions when Lakamp was in discussion with Winston during this period (Tr. 631–32; DX 2, p. 2) he told Winston that:

(1) Winston should avoid taking excessive advantage of the freedom with which he operated, particularly with respect to budgeting his time, in order to make certain that his responsibilities were being fully met. (Tr. 145–46, 632; DX 2, p. 2).

(2) Winston should exercise greater caution in his work because his errors were creating problems for himself and others at SSIE and reflected poorly on SSIE. (Tr. 146, 632; DX 2, p. 2).

(3) Winston should plan his time so he could improve the rate at which he performed his routine duties because the rate at which he was actually performing them did not allow an opportunity for him to take on the additional responsibilities that were originally planned for him. (Tr. 147, 632; DX 2, p. 2).

(4) Winston should be more judicious about providing nonroutine information to people outside SSIE (such as customers) because the information given was sometimes erroneous. (Tr. 147, 632–33; DX 2, p. 3).

Winston's response to this counselling was that Lakamp did not understand the complexity of his assignments, that he was overworked and would not have time to take on the additional responsibilities which Lakamp had planned for him, and that he needed a full-time assistant to help him carry out his present duties. (Tr. 633; DX 2, p. 2).

59. During this same period from the end of 1972 to December 1973 Lakamp observed Winston's work performance. (Tr. 633–34). He observed that Winston was frequently away from his desk (Tr. 634), that he irritated the people assigned to help him with clerical tasks by insisting on a need for assistance with tasks he preferred not to do at a time when he had little else to occupy his time (Tr. 147–49, 634; DX 2, p. 3), and that when assistance was provided to him he would frequently attempt to supervise those people helping him when no supervision was necessary. (Tr. 634). Lakamp advised Winston that his judgment and his ability to manage his own time effectively were of sufficiently poor quality that it was considered unlikely that Winston would be able to perform well in the role of a supervisor. (Tr. 148–49; DX 2, p. 3).

60. During 1973 Lakamp advised Hersey of his dissatisfaction with Winston's job performance. At the same time Winston was advising Hersey of his belief that he did not have enough time to perform the duties he was responsible for. (Tr. 452–53).

61. Lakamp from time to time sought help from SSIE employees to assist Winston in the performance of his duties on a temporary basis. (Tr. 630).

62. During this year of counselling Lakamp had removed certain of Winston's responsibilities, particularly time-consuming clerical functions, to allow him additional time to perform his full range of responsibilities and to assume new responsibilities. (Tr. 634, 687; DX 2, p. 2).

63. Throughout the period that Lakamp was responsible for the supervision of Winston, Winston was given substantial assistance in performing his job responsibilities. (Tr. 348, 350–53, 361–62, 371, 453–54, 472–73, 481–82, 531–32, 534, 541–42, 709; DX 8). The figures set forth below show the total number of SSIE invoices monthly for the period July 1971 through August 1974 and the number of those invoices which bear Winston's initials as the preparer versus, under the column captioned "other," the number of invoices bearing either no initials or the initials of other SSIE employees such as Matthews, VanDertholen, William Thomas, Kirlew, Banks, Jones and others. (Tr. 543–46; DX 8).

| Date | Winston | Other | Total |
|------|---------|-------|-------|
| 7/71 | 1 | 128 | 129 |
| 8/71 | 40 | 57 | 97 |
| 9/71 | 82 | 21 | 103 |
| 10/71 | 87 | 41 | 128 |
| 1/72 | 77 | 121 | 198 |
| 2/72 | 132 | 79 | 211 |
| 3/72 | 126 | 41 | 167 |
| 4/72 | 117 | 62 | 179 |
| 5/72 | 113 | 40 | 153 |
| 6/72 | 65 | 40 | 105 |
| 7/72 | 53 | 98 | 151 |
| 8/72 | 56 | 79 | 135 |
| 9/72 | 26 | 110 | 136 |
| 10/72 | 7 | 165 | 172 |
| 11/72 | 9 | 156 | 165 |
| 12/72 | 37 | 113 | 150 |
| 1/73 | 13 | 110 | 123 |
| 2/73 | 100 | 83 | 183 |
| 3/73 | 107 | 60 | 167 |
| 4/73 | 65 | 76 | 141 |
| 5/73 | 66 | 146 | 212 |
| 6/73 | 40 | 136 | 176 |
| 7/73 | 39 | 167 | 206 |
| 8/73 | 60 | 182 | 242 |
| 9/73 | 80 | 176 | 256 |
| 10/73 | 44 | 240 | 284 |
| 11/73 | 30 | 313 | 343 |
| 12/73 | 32 | 206 | 238 |
| 1/74 | 20 | 295 | 315 |
| 2/74 | 17 | 281 | 298 |
| 3/74 | 3 | 284 | 287 |
| 4/74 | 0 | 258 | 258 |
| 5/74 | 0 | 277 | 277 |
| 6/74 | 0 | 214 | 214 |
| 7/74 | 0 | 137 | 137 |
| 8/74 | 0 | 30 | 30 |

(DX 8; Tr. 546). These figures have not been challenged.

64. On several days during December 1973 (and on other occasions in January or February 1974) Lakamp performed substantially all Winston's job duties during Winston's absence. (Tr. 635; DX 2, p. 3). In performing Winston's work, Lakamp observed that Winston had consistently ignored clearly designated priorities and that Winston's performance of routine functions and the execution of his responsibilities was consistently unsatisfactory. (Tr. 635, 687; DX 2, p. 3). Based upon his experience gained from performing Winston's work, Lakamp concluded that Winston had grossly over-represented the amount and complexity of his work, (Tr. 635), that Winston had not accepted his responsibilities (Tr. 636), that Winston would require closer supervision (Tr. 636); and that he would formally review Winston's job performance on a periodic basis. (Tr. 636).

65. On about December 13, 1973, Lakamp prepared a written appraisal of Winston's job performance. (Tr. 636; PX 27). At the same time he requested and received written appraisals from Evelyn Roll (Tr. 636–37; DX 18) and Janet Goldstein (hereafter "Goldstein"). (Tr. 636–37; DX 19). Goldstein had been reviewing the SSIE processing system for customer requests and had had occasion to work closely with Winston. (Tr. 637).

66. The first rating factor on each of the written appraisal forms inquired:

"Amount of work produced. (Consider the work produced in relation to requirements of the position.)" (PX 27; DX 18, 19).

In response to this rating factor Lakamp, Roll and Goldstein each graded Winston:

"Work output is far below level expected." (PX 27; DX 18, 19).

67. On about January 7, 1974, Lakamp met with Winston and discussed with him the problems in his job performance which Lakamp had observed when he had performed Winston's work during the time he had been absent in December. (Tr. 639–40; DX 2, p. 3). Lakamp reviewed his December 13, 1973 appraisal with Winston and told him that his performance was unsatisfactory, clearly did not warrant award of his next in-grade increase, and that unless Winston's performance improved action would be taken to either adjust his responsibilities to his level of performance or increase the amount of his direct supervision or both. (Tr. 159, 639–41, 687; DX 2, p. 3). Winston replied that Lakamp did not understand the complexity of Winston's job, that he was hopelessly overworked, and that Lakamp's appraisal of his job performance was unfair and unjustified. (Tr. 640; DX 2, p. 4). Lakamp asked Winston to sign the appraisal so that the record would reflect that Winston had received it. (Tr. 154–55; PX 27). Winston refused, and Lakamp explained that signing was not an acknowledgement of its accuracy but only a record that it had been reviewed with him.

(Tr. 154–55). Winston still refused to sign. (Tr. 154–55; PX 27).

68. At this meeting Winston made no claim that he believed Lakamp was prejudiced or was discriminating against him. (Tr. 640; DX 2, p. 4). Winston refused to sign this and all subsequent appraisals of his job performance because he did not believe the form was proper or that the evaluations were fair. (Tr. 110, 149–52, 154; DX 2, p. 5; DX 20).

69. When in December 1973 and January 1974 the disagreement between Lakamp and Winston concerning his job performance came to a head, both Lakamp and Winston had meetings with Hersey at which they expressed their respective versions of the disagreement. (Tr. 454–57). Hersey then had discussions with Verfuerth, Roll and Lakamp for the purpose of determining the basis for the disagreement, which version of the facts had the greater credence, and whether Lakamp was being unfair to Winston. (Tr. 457–59). It was Hersey's belief that Lakamp treated Winston no differently than any other employee. (Tr. 459).

70. During the period between Lakamp's January 7, 1974 meeting with Winston and April 1974, Lakamp observed no improvement in Winston's performance. (DX 2, p. 4). In Lakamp's judgment closer supervision, increased counselling, and more specific recommendations for improving Winston's performance were having no effect. (DX 2, p. 4). Winston had not performed his job well, effectively or efficiently. (Tr. 684).

71. On about March 14, 1974, Lakamp met with Winston concerning the lack of improvement in his job performance and reiterated that if his performance did not improve, action would be taken either to reduce his responsibilities or increase his direction by assigning another supervisor to him or both. (Tr. 641, 681–82; DX 2, p. 4). Lakamp at this meeting suggested to Winston that in view of the already serious problems he was having in the performance of his official duties his recent acceptance of responsibilities as SSIE's representative

to the Employee Recreation Association may have been ill-advised and that his official duties would have to take precedence over his Recreation Association activities. (Tr. 641; DX 2, p. 4). Winston then asked Lakamp about opportunities for training and promotion. Lakamp responded that at Winston's current level of performance he had none. (Tr. 641; DX 2, p. 4). Winston responded by telling Lakamp that he no longer felt comfortable with Lakamp as his supervisor and suggested that Lakamp was not qualified to be his supervisor. (Tr. 161–62, 641, 683–84; DX 2, p. 4). Lakamp told Winston that if he felt strongly enough about this statement he should seriously consider seeking employment elsewhere. (Tr. 641; DX 2, p. 4).

72. By a letter dated March 14, 1974 to Winston, Lakamp encouraged Winston to look for other employment. (Tr. 641–42; PX 28).

73. On about April 30, 1974, Lakamp prepared a written appraisal of Winston's job performance. (Tr. 644–45; DX 20). In this appraisal Lakamp graded Winston:

"Work output is far below level expected." (DX 20)

*and*

"Work frequently has to be redone." (DX 20)

*and*

"Gets behind schedule unless closely supervised." (DX 20)

74. On or about May 1, 1974, Lakamp met with Winston, reviewed the April 30, 1974 appraisal with him, and advised Winston that Offutt would be transferred from the Data Processing Division (together with most of her already existing responsibilities) and assigned to directly supervise him. (Tr. 646; DX 2, p. 4). When requesting Offutt to supervise Winston, Lakamp indicated dissatisfaction with Winston's work. (Tr. 896). The assignment of Offutt to supervise Winston was discussed by Lakamp with Hersey and approved by Hersey. (Tr. 460).

75. On about May 6, 1974, Offutt assumed direct supervision of Winston. (Tr.

646; DX 2, p. 5). That same day Offutt met with Winston. Winston told Offutt that he did not intend to answer any of her questions concerning his duties because he did not believe Offutt was qualified to be his supervisor. (Tr. 357, 647, 873–74, 895; DX 2, p. 5). Later that same day Lakamp, Winston, and Offutt met. Winston again stated that Offutt was not qualified to be his supervisor and that if she were, she should know his functions. (Tr. 648–49; DX 2, p. 5). Lakamp told Winston that further insubordination would not be tolerated. (Tr. 167, 648; DX 2, p. 5).

76. On about June 4, 1974, Lakamp informed Winston that until further notice the use of sick leave must be substantiated by a doctor's certificate and that annual leave could not be taken at Winston's sole discretion—that is, Winston would be required to obtain supervisory permission before taking annual leave. (Tr. 649–51; PX 32).

77. The pattern of Winston's use of annual and sick leave for the period preceding Lakamp's June 4, 1974 action is reflected in defendants' Exhibit 50. Set forth below is the pattern of this leave for the period July 1972 to August 1974 as reflected in this exhibit. "M," "T," "W," etc., represent the days Monday through Friday. "A" represents annual leave; "S" represents sick leave; and "OT" represents overtime.

| Year | Month | Date and Day | Hours of Leave |
|---|---|---|---|
| 1972 | July | 24 M | 8 A |
| | | 25 T | 8 A |
| | | 26 W | 8 A |
| | | 27 Th | 8 A |
| | | 28 F | 8 A |
| | | 31 M | 8 A |
| | August | 1 T | 8 A |
| | | 2 W | 8 A |
| | | 3 Th | 8 A |
| | | 4 F | 8 A |
| | | 23 W | 1 A |
| | | 24 Th | 1 A |
| | September | 8 F | 8 A |
| | | 14 Th | 8 A |
| | | 25 M | 3 A |
| | October | 6 F | 4 A |
| | | 21 S | 6 OT |
| 1972 | November | 1 W | 2 A |
| | | 3 F | 1 A |
| | December | 1 F | 4 S |
| | | 4 M | 8 S |
| | | 5 T | 8 S |
| 1973 | January | 2 T | 8 S |
| | | 3 W | 8 S |
| | | 4 Th | 4 S |
| | | 5 F | 8 S |
| | | 8 M | 8 S |
| | | 9 T | 8 S |
| | | 10 W | 4 S |
| | | 11 Th | 4 S |
| | | 12 F | 4 S |
| | | 15 M | 8 A |
| | February | 9 F | 1 A |
| | | 23 F | 4 A |
| | March | 7 W | 5 A |
| | | 12 M | 8 A |
| | | 22 Th | 2 A |
| | | 26 M | 8 A |
| | | 30 F | 8 A |
| | April | 2 M | 8 A |
| | | 3 T | 8 A |
| | | 4 W | 8 A |
| | | 5 Th | 8 A |
| | | 6 F | 8 A |
| | | 16 M | 3 A |
| | | 25 W | 2 A |
| | May | 2 W | 8 A |
| | | 15 T | 2 A |
| | June | 8 F | 4 S |
| | | 18 M | 3 A |
| | July | — — | |
| | August | 6 M | 8 A |
| | | 16 Th | 1 A |
| | September | 4 T | 4 S |
| | | 7 F | 8 S |
| | | 20 Th | 4 OT |
| | | 18 T | 8 A |
| | | 21 F | 1 S |
| | October | 1 M | 8 S |
| | | 5 F | 4 S |
| | | 16 T | 8 S |
| | | 19 F | 1 A |
| | November | 5 M | 1 A |
| | | 15 Th | 1 A |
| | | 16 F | 4 A |
| | | 19 M | 8 A |
| | December | 3 M | 3 A |
| | | 4 T | 1 A |
| | | 12 W | 8 S |
| | | 13 Th | 1 S |
| | | 17 M | 8 A |
| | | 18 T | 8 A |
| | | 19 W | 8 A |
| | | 27 Th | 1 A |
| 1974 | January | 3 Th | 1 A |
| | | 16 W | 8 S |
| | | 17 Th | 8 S |
| | | 18 F | 8 S |

| Year | Month | Date and Day | Hours of Leave |
|---|---|---|---|
| 1974 | January | 24 Th | 4 A |
| | | 28 M | 2 A |
| | | 29 T | 1 A |
| | | 30 W | 1 A |
| | | 31 Th | 1 A |
| | February | 5 T | 4 S |
| | | 6 W | 8 S |
| | | 7 Th | 8 S |
| | | 8 F | 8 S |
| | | 11 M | 8 S |
| | | 12 T | 8 S |
| | | 13 W | 4 S |
| | | 14 Th | 8 S |
| | | 15 F | 8 S |
| | March | 14 Th | 1 A |
| | | 26 T | 1 A |
| | | 27 W | 1 A |
| | April | 2 T | 1 S |
| | | 10 W | 8 S |
| | | 11 Th | 8 S |
| | | 15 M | 1 S |
| | | 16 T | 3 A |
| | | 23 T | 4 A |
| | | 25 Th | 4 A |
| | | 26 F | 3 A |
| | | 29 M | 8 S |
| | | 30 T | 8 S |
| | May | 1 W | 2 A |
| | | 2 Th | 1 A |
| | | 6 M | 1 A |
| | | 7 T | 8 A |
| | | 15 W | 4 A |
| | | 21 T | 5 S |
| | | 29 W | 1 S |
| | June | 3 M | 8 S |
| | | 25 T | 2 A |
| | July | 5 F | 3 A |
| | | 15 M | 1 A |
| | | 22 M | 5 S |
| | | 30 T | 5 A |
| | August | 1 Th | 3 A |
| | | 5 M | 1 A |
| | | 6 T | 2 A |
| | | 8 Th | 3 A |
| | | 14 W | 1 A |

78. On about June 4, 1974, when Lakamp took action with respect to Winston's unsupervised use of sick and annual leave, he was unaware that Winston had filed a charge of racial discrimination against SSIE. (Tr. 651). On about May 23, 1974, Winston had in fact filed with the Smithsonian a written charge of racial discrimination against SSIE. (PX 30). Lakamp was named as the individual against whom the charge was made; Hersey was not named. (PX 30). The most recent act of discrimination alleged was the assignment of Offutt to supervise Winston. (PX 30). Hersey was not named in the charge until August 16, 1974 (PX 30)—three days after Winston learned of the decision of Hersey and Lakamp to terminate his employment. (Tr. 659, 674–75; PX 57).

79. Winston's May 23, 1974 complaint of racial discrimination was investigated by Smithsonian's Office of Equal Employment Opportunity headed by Grimmett. (Tr. 329, 336). The investigation and its findings of fact were reviewed by Grimmett, who found no problems and referred the case to Verfuerth, SSIE's EEO officer, for further proceedings. (Tr. 336–39; DX 4). Verfuerth subsequently made a proposed finding of no discrimination based upon the investigation and findings of fact conducted by Grimmett's office. (Tr. 115, 340; DX 4). Grimmett, who is black, reviewed the proposed finding of no discrimination, found no clear indication of discrimination, and permitted a proposed disposition of the complaint by Verfuerth to go forward on the basis of this finding. (Tr. 341–44; DX 4).

80. In late 1973 or early 1974 when Winston first met with Grimmett for EEO counselling, it was Grimmett's belief that Winston did not feel racial discrimination was being practiced against him. (Tr. 334).

81. During June 1974, Lakamp asked for and received from Offutt a written appraisal of Winston's job performance as part of a continuing series of performance reviews which Lakamp, in January 1974, had told Winston he would conduct. (Tr. 651–52, 896–97; PX 29A). Offutt prepared this appraisal on about June 14, 1974. (Tr. 896–97; PX 29A). In this appraisal she graded Winston:

"Work output is far below level expected."

*and*

"Gets behind schedule unless closely supervised." (PX 29A). On about June 24, 1974, Offutt communicated to Lakamp her concern that during the past month Winston's mistakes had been great and that she had to proofread "all requests." (Tr. 652–53, 898; DX 22).

82. In late June or early July 1974, Lakamp met with Winston and Offutt to review with Winston Offutt's appraisal of his job performance. (Tr. 169, 653–54; DX 2, p. 5). At this meeting Winston asked for and received from Lakamp specific examples of his unsatisfactory performance. (Tr. 169–70, 654; DX 2, pp. 5–6). During the following month Winston's job performance did not improve. (Tr. 654). Mindless errors were found almost daily and brought to Winston's attention; and the rate at which he worked prevented the assignment of additional duties which would be necessary if Winston were to perform at his existing grade level. (DX 2, p. 6).

83. On about July 24, 1974, Offutt prepared a second appraisal of Winston's job performance, which was submitted to Lakamp. (Tr. 654–55; PX 29B). Lakamp considered this appraisal no improvement over Offutt's first appraisal. (Tr. 655). It was Lakamp's observation during this period that Winston became virtually impossible to manage, arrogant, resistant to any kind of management instructions or directions, and very difficult to deal with. (Tr. 655).

84. From 1972 to 1974 Winston had received complaints about his work performance from SSIE's scientists/analysts. (Tr. 88–89). Because he was often away from his desk, these persons were unable to locate him. (Tr. 539, 541).

85. Miriam VanDertholen (hereafter "VanDertholen") was employed by SSIE from October 1968 until May 1976. In the summer of 1972 she was assigned to work in the office of the President as a receptionist and typist. (Tr. 345, 347–48, 352–53, 360). There she assisted Winston in the performance of his duties, primarily by typing and filing invoices. (Tr. 348, 350–52). Initially VanDertholen volunteered to assist Winston by typing invoices. It soon became his habit to leave all the invoices on her desk to be typed on a daily basis. (Tr. 351–52, 361–62, 371). She observed that Winston did not stay at his desk very much and towards the end of 1972 or in early 1973 she complained on several occasions to

Lakamp, her supervisor, about Winston's taking advantage of her by virtue of his frequent absences from his desk. (Tr. 354, 362–64). She further observed that Winston took longer breaks and lunches than usual. (Tr. 369). Some of the scientific staff also complained to VanDertholen regarding Winston's frequent absences from his desk, which occurred on a regular basis beginning when she was first assigned to the office of the President. Similarly, the mail clerk, William Thomas, who is black and also assisted Winston in typing invoices, complained to VanDertholen on several occasions regarding his having to assist Winston when Winston wasn't at his desk to do the work himself. (Tr. 355–56).

86. Paul Muniz (hereafter "Muniz") has been employed by the defendant SSIE from November of 1963 to the present in a secretarial position. (Tr. 528). He has been located in the office of the President for approximately eight years. (Tr. 529, 532). Winston was working in the same office when Muniz was transferred there, and Muniz had occasion to observe Winston on a daily basis. He observed that Winston was frequently away from his desk on a daily basis and that this pattern persisted until the time Winston left the Exchange. (Tr. 529–30, 533, 536). He further observed that members of the scientific staff would frequently try to locate Winston to obtain numbers for customer searches but were often unable to find him. (Tr. 533, 535–36). He also observed other individuals assisting Winston in the discharge of his duties, including Miriam VanDertholen, Annette Matthews and William Thomas. (Tr. 531–32, 534).

87. William H. Payne (hereafter "Payne") has been employed at SSIE since 1963 as a member of the scientific staff, being Chief of the Engineering and Materials Branch. (Tr. 613). In July of 1966 Payne prepared a memorandum commending Winston for his work on a project. (Tr. 614; DX 17). Once Winston moved to the front office, Payne had occasion to contact Winston to follow up on the progress of requests which came into the Exchange;

and this work relationship continued for several years. (Tr. 615). He observed that Winston was frequently not present during working hours, and Payne was unable to contact him readily. When Payne was able to locate Winston, Winston was often unable to find the information which Payne needed. (Tr. 615–16; 618).

88. Dr. Charlotte Damron-Smith, a member of the scientific staff since 1955, Rhoda S. Goldman, Chief of the Behavioral Sciences Branch, and Claire D. Jaffe, a member of the scientific staff since 1963, all had occasion to contact Winston on a regular basis from the time he was responsible for logging in and out customer requests and invoicing those requests. They would go to Winston to have a number assigned to a request or to find out whether information they had gathered in response to such requests had been mailed to the requesting client. (Tr. 592–93, 597, 604, 609–10). They each experienced frequent difficulty in locating Winston at his desk, and this created a bottleneck at Winston's desk. This continued for the entire period he was in the front office. (Tr. 593, 595, 604–05, 610). The scientists made complaints to Lakamp or Verfuerth regarding Winston's frequent absences from his desk. (Tr. 593, 605, 610).

89. Based upon her supervision of Winston during the period May through August 1974, it was Offutt's judgment in August 1974 that Winston was an unsatisfactory employee. (Tr. 899).

90. On about August 9 or 10, 1974, Lakamp reached the decision that Winston's employment should be terminated on the following grounds, which were cumulative over a seven-month period. (Tr. 704–09):

(1) Winston either was unwilling to perform his assigned duties or was incapable of performing them in the manner required of someone in his position. (Tr. 657, 702; DX 2, p. 7).

(2) Winston was unwilling to work. (Tr. 655, 709).

(3) Winston was resistant to any kind of management instructions or directions. (Tr. 655, 709).

(4) Winston was arrogant, intransigent, and very difficult to deal with. (Tr. 655, 709).

91. On August 10, 1974, Lakamp prepared a seven-page recapitulation of events describing his supervision of Winston. (Tr. 625). We accept this recapitulation of events, which is defendants' Exhibit 2, as a true and accurate reflection of the events recorded therein. (Tr. 626, 712). The recapitulation was supported in part by a series of contemporaneous documents beginning in January 1974 pertaining to Winston's performance which Lakamp prepared and maintained in his file. (Tr. 611; PX 51–55).

92. On August 12, 1974, Lakamp informed Hersey that Winston's performance had not improved despite repeated discussions which Lakamp had had with Winston regarding his performance, and recommended that Winston be given the opportunity of either resigning or having his employment terminated. (Tr. 460–61, 657–58). At that time Lakamp gave Hersey a copy of his August 10, 1974 recapitulation of events (Tr. 461, 626, 658) which Hersey reviewed. (Tr. 461).

93. On the basis of the things which he knew and had observed since 1972 and on the basis of his review of Lakamp's August 10, 1974 recapitulation of events, Hersey concurred in Lakamp's recommendation to terminate Winston's employment. (Tr. 461–62, 658–59).

94. On August 13, 1974, Lakamp told Winston that his employment would be terminated as soon as possible. (Tr. 659, 674–75; PX 57).

95. The next day, on August 14, 1974, Lakamp received a written request from Winston in which Winston requested that SSIE either:

(1) Adjust his work schedule to allow him to attend college while continuing his job at SSIE on a full-time basis, or

(2) Grant him a leave of absence to obtain a college degree in business administration. (Tr. 487, 659–60; PX 34).

96. On August 20, 1974, Lakamp met with Winston and informed him that his

request for an adjustment in his work schedule or leave without pay had been denied. (Tr. 660–61; PX 35). The decision to deny Winston's request for an adjustment of his work schedule or leave without pay was approved by Hersey after discussion with Lakamp. (Tr. 494–95).

97. By letter dated August 21, 1974 from Winston to Lakamp, Winston resigned his employment with SSIE effective September 3, 1974. (Tr. 172; PX 36). The letter stated:

"After some consideration in regards to my educational development, full time employment and attending school evenings has become difficult in attaining my degree in Business Administration without a lengthy and prolonged evening school attendance.

"My nine (9) years, October 1974, of service with the Exchange has proven to be a worthwhile and experience filled tenure.

"With hopes that you understand the situation I am faced with, this letter would serve as my resignation to develop my academic potential. I hope you can appreciate my decision. This resignation is to be effective September 3, 1974."

This resignation letter was prepared by Winston and delivered by him to Lakamp on August 21, 1974. (Tr. 172, 661).

98. At the end of September 1974 SSIE hired a replacement for Winston, who from that date to the present has performed the functions which Winston had been performing under Offutt's supervision. (Tr. 662–63).

99. No decision made by Hersey or Lakamp with respect to the terms, conditions or termination of Winston's employment was ever based upon or influenced to any degree by:

(1) Winston's race. (Tr. 462, 663);

(2) Winston's claim of racial discrimination. (Tr. 527, 663–64); or

(3) Winston's opposition to practices which he claimed were racially motivated. (Tr. 527, 664).

100. Winston's deficiencies in the performance of the duties of his job were aggravated by a personality conflict between him and Lakamp. (Tr. 902–03, 807–09).

101. SSIE is a private corporation which operates under the control of a board of directors, a majority of the directors being Smithsonian employees. (Tr. 698). SSIE tries to follow the Smithsonian Handbook for Employees, although SSIE was not specifically bound by the Handbook. (Tr. 713). With respect to personnel actions, SSIE was not bound by either Civil Service Commission or Smithsonian rules. (Tr. 512–13, 516–19, 521–22, 568–69, 571–72).

102. The Smithsonian's Handbook for Employees provides with respect to unsatisfactory performance that:

If an employee's performance is not at least satisfactory, he may be given an "unsatisfactory" rating. If he has completed his probationary period, he must be given 90 days advance warning and a reasonable opportunity to demonstrate satisfactory performance. A performance rating of unsatisfactory is a basis for removal from the position. (PX 22).

103. The Smithsonian Handbook requires that an employee must be given 90 days' warning that his performance is unsatisfactory and a reasonable opportunity to demonstrate satisfactory performance. Unsatisfactory performance is a basis for termination of employment. (PX 22). The Handbook does not require that an employee be given any advance notice of a decision to terminate for unsatisfactory performance nor does the Handbook require any notice or waiting period for termination to be effective once the decision to terminate is made and the employee is notified. (Tr. 502–04, 699, 712; PX 22).

104. Winston was given notice in January 1974 that his performance was unsatisfactory, and his unsatisfactory performance was reviewed with him at that time. (Tr. 701, 712–13). Winston's performance between the period January 1974 and August 1974 did not improve but grew steadily worse. (Tr. 643–45, 654–55, 667, 702, 704, 709, 899; DX 2, pp. 4, 6–7).

105. At the time the decision was made on August 12, 1974, to terminate Winston's employment and for several months prior thereto, all actions pertaining to Winston were reviewed by Smithsonian's Personnel Office and its General Counsel's Office. (Tr. 658–59, 700–01, 714). Winston's separation from the employ of SSIE was caused by his resignation (Tr. 505, 713; PX 36), and his official personnel record so reflects. (Tr. 713; DX 53 # 213). Winston chose resignation over firing because it was less damaging to potential employment possibilities. (Pl's Ans. to Int. 19(c) of Defs' First Set).

106. Both plaintiff and defendants presented statistical evidence through qualified experts in the fields of data and statistical analysis to support their respective positions.

107. The number of SSIE nonprofessional employees by race and year from 1964 to 1976 and the number of blacks as a percentage of the total SSIE work force for each of those years is as follows:

| Year | Blacks | Whites & Others | Total | Blacks as % of Total |
|---|---|---|---|---|
| 1964 | 42 | 66 | 108 | 39 |
| 1965 | 44 | 63 | 107 | 41 |
| 1966 | 52 | 62 | 114 | 46 |
| 1967 | 48 | 47 | 95 | 51 |
| 1968 | 47 | 46 | 93 | 51 |
| 1969 | 36 | 33 | 69 | 52 |
| 1970 | 33 | 36 | 69 | 48 |
| 1971 | 25 | 29. | 54 | 46 |
| 1972 | 23 | 28 | 51 | 45 |
| 1973 | 21 | 31 | 52 | 40 |
| 1974 | 22 | 31 | 54 | 42 |
| 1975 | 24 | 33 | 57 | 42 |
| 1976 | 24 | 35 | 59 | 41 |

(DX 11, 12, 13; Tr. 548–51). Plaintiff has not attempted to prove that the SSIE minority work force was less than representative, since there have been twice the number of black nonprofessionals at SSIE than in the Washington area.

108. The number of blacks as a percentage of the total SSIE work force exceeds the percentage of blacks available in the standard metropolitan statistical area work force for each of the years regardless of the nature of the jobs involved. (DX 30).

109. The number of SSIE nonprofessional hirees by race and year is as follows:

| Year | Blacks | Whites & Others | Total |
|---|---|---|---|
| 1964 | 11 | 13 | 24 |
| 1965 | 10 | 13 | 23 |
| 1966 | 4 | 4 | 8 |
| 1967 | 7 | 6 | 13 |
| 1968 | 5 | 1 | 6 |
| 1969 | 5 | 7 | 12 |
| 1970 | 0 | 1 | 1 |
| 1971 | 2 | 3 | 5 |
| 1972 | 2 | 2 | 4 |
| 1973 | 2 | 4 | 6 |
| 1974 | 4 | 4 | 8 |
| 1975 | 2 | 4 | 6 |
| 1976 | 5 | 9 | 14 |

(DX 14; Tr. 552). Plaintiff has not alleged discrimination in hiring.

110. The number of nonprofessional promotions at SSIE by race and year is as follows:

| Year | Blacks | Whites & Others | Total |
|---|---|---|---|
| 1964 | 13 | 13 | 26 |
| 1965 | 16 | 12 | 28 |
| 1966 | 12 | 15 | 27 |
| 1967 | 4 | 10 | 14 |
| 1968 | 11 | 4 | 15 |
| 1969 | 15 | 5 | 20 |
| 1970 | 1 | 4 | 5 |
| 1971 | 1 | 0 | 1 |
| 1972 | 5 | 8 | 13 |
| 1973 | 9 | 3 | 12 |
| 1974 | 7 | 3 | 10 |
| 1975 | 3 | 4 | 7 |

(DX 15, 16; Tr. 553). Plaintiff apparently does not challenge the above figures, but contends that the promotions received by white nonprofessionals were generally in greater increments of grade, pay, and responsibility than those received by blacks.

111. In 1964 the median nonprofessional black pay grade was grade 3; the median nonprofessional white pay grade was 5. By 1965 the median black grade had risen to 4; the median white grade had risen to 7. The black median remained at grade 4 until 1973, when it rose to 5. The white grade rose to 9 in 1966, and to 11 in 1969, where it remained until 1974. (PX 38J) A comparison of the average grade over time of black and white nonprofessionals hired in each of the years 1964 through 1969 demonstrates

**472**

that, for the actual employees hired in those years, the white employees generally started at higher grades and progressed more rapidly through higher grade levels. (PX 38S, 38T, 38U, 38V, 38W, 38X).

112. Defendants' expert developed job groupings of SSIE employees in order to ascertain whether any of the employment patterns were statistically unusual. (Tr. 735–39; DX 28, 29, 31, 32). A utilization analysis was done of employees in the SSIE work force for the period of 1964 to 1976 which analyzed the incumbents in each job grouping (i. e., manager/administrator, computer specialist, computer operator, clerical grades 9–12, and clerical grades 2–8) by race for each year (i. e., as of January 31 for each year with the exception of 1972 where December 31, 1971 data was used).

113. Calculations were made by defendants' expert to determine the *expected* number of blacks in the SSIE work force as of January 31 of each year (1964–76, except for 1972 for which December 31, 1971 data was used) taking into account the work force availabilities in the various job groupings. The results were as follows:

Number of Black Employees by Year

| Year | Actual | Expected |
|------|--------|----------|
| 1964 | 42 | 25.8 |
| 1965 | 44 | 25.7 |
| 1966 | 52 | 26.6 |
| 1967 | 48 | 22.4 |
| 1968 | 47 | 20.8 |
| 1969 | 36 | 15.2 |
| 1970 | 33 | 15.0 |
| 1971 | 25 | 11.6 |
| 1972 | 23 | 10.9 |
| 1973 | 21 | 11.0 |
| 1974 | 22 | 11.3 |
| 1975 | 24 | 12.1 |
| 1976 | 24 | 12.6 |

(DX 33; Tr. 753–55).

114. Similar calculations were made for the *expected* number of black employees as a percentage of the total work force, 1964–76, again taking into account the availability rates by job groupings. The results were as follows:

Black Employees as Percentage of Total Work Force by Year

| Year | Actual % | Expected % |
|------|----------|------------|
| 1964 | 39 | 24 |
| 1965 | 41 | 24 |
| 1966 | 46 | 23 |
| 1967 | 51 | 24 |
| 1968 | 51 | 22 |
| 1969 | 52 | 22 |
| 1970 | 48 | 22 |
| 1971 | 46 | 22 |
| 1972 | 45 | 21 |
| 1973 | 40 | 21 |
| 1974 | 42 | 22 |
| 1975 | 42 | 21 |
| 1976 | 41 | 21 |

(DX 34; Tr. 755–56).

115. Plaintiff's expert admitted that there was a greater proportion of blacks in the SSIE work force than in the overall population. He did not take into account prior work experience or training to account for differences in grade levels (Tr. 227–28, 235–37) and did no job groupings. He, in fact, had doubts whether statistics were appropriate to this case (Tr. 247–48, 846, 860), probably because of the smallness of the universe under study.

116. It is not possible to conclude from the expert testimony and statistical presentation that there has been disparate treatment of blacks. The statistics are consistent with a nondiscriminatory, or at least a neutral, employment policy.

*Conclusions of Law*

1. The Court has jurisdiction over the subject matter and the parties, and venue is proper in the District of Columbia.

2. The defendant SSIE is an employer within the meaning of Section 701(b) of Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000e(b).

3. Plaintiff has complied with the procedural requirements of Sections 706(b), (e) and (f)(1) of Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. §§ 2000e–5(b), (e), and (f)(1).

4. In a private individual Title VII suit, the plaintiff must carry the initial burden of establishing a prima facie case of discrimination. The burden then shifts to the employer to articulate some "legitimate nondiscriminatory reason" for the action

taken against the plaintiff. Then the plaintiff must be afforded an opportunity to show that the defendant's stated reason for its action was in fact a pretext. *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Accord, Kinsey v. First Regional Securities, Inc.,* 557 F.2d 830 (D.C.Cir.1977); *Garrett v. Mobil Oil Corp.,* 531 F.2d 892, 895 (8th Cir.), *cert. denied,* 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976); *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 399 (3rd Cir. 1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977).

5. Although *McDonnell Douglas Corp. v. Green, supra,* involved a Title VII action challenging an employer's refusal to hire, its principles have been applied to other situations such as discharge cases. *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277 (7th Cir. 1977); *Garrett v. Mobil Oil Corp., supra; Potter v. Goodwill Industries,* 518 F.2d 864 (6th Cir. 1975). But see *Stevens v. Junior College District,* 548 F.2d 779 (8th Cir. 1977); *King v. Yellow Freight Systems, Inc.,* 523 F.2d 879, 882 (8th Cir. 1975). *See also Henry v. Ford Motor Co.,* 553 F.2d 46, 47 n. 3 (8th Cir. 1977).

6. The principles for allocating burden of proof in Title VII cases are equally applicable to actions brought under 42 U.S.C. § 1981. E. g., *Sabol v. Synder,* 524 F.2d 1009 (10th Cir. 1975); *Long v. Ford Motor Co.,* 496 F.2d 500 (6th Cir. 1974); *Waters v. Wisconsin Steel Works,* 502 F.2d 1309 (7th Cir. 1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). ("Title VII and section 1981 are 'parallel or overlapping remedies against discrimination.' *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Consequently, in fashioning a substantive body of law under section 1981 the courts should, in an effort to avoid undesirable substantive law conflicts, look to the principles of law created under Title VII for direction.") *See also Johnson v. Railway Express Agency,* 421 U.S. 454, 461, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). *Cf. United States v. Chesterfield County School District,* 484 F.2d 70 (4th Cir. 1973).

7. Plaintiff has failed to carry his burden of establishing a prima facie case of racial discrimination. *McDonnell Douglas Corp. v. Green, supra. See also Olson v. Philco-Ford,* 531 F.2d 474, 478 (10th Cir. 1976); *Sime v. Trustees of the California State University and Colleges,* 526 F.2d 1112, 1113–14 (9th Cir. 1975).

8. Even assuming arguendo that the plaintiff has established a prima facie case of racial discrimination, the defendant SSIE has completely rebutted whatever prima facie case was made by articulating legitimate, nondiscriminatory reasons for its actions respecting the plaintiff. *McDonnell Douglas Corp. v. Green, supra. See also King v. Yellow Freight Systems, Inc., supra; Naraine v. Western Electric Co.,* 507 F.2d 590, 594 (8th Cir. 1974).

9. Assuming arguendo that plaintiff made a prima facie case of racial discrimination, defendant SSIE has completely rebutted plaintiff's charges. Once having proved that defendants' actions were for cause, the burden of persuasion returned to the plaintiff to show that the defendants' stated reasons for its actions were in fact a pretext for discrimination prohibited by Title VII. *McDonnell Douglas Corp. v. Green, supra.* Plaintiff has failed to meet this burden.

10. It is axiomatic that under the statutory scheme of Title VII (or 42 U.S.C. § 1981) an employer may make an employment decision for a good reason, a bad reason, or no reason at all so long as racial or other discriminatory distinctions do not influence the decision. *Harper v. TWA,* 385 F.Supp. 1001, 1004 (E.D.Mo.1974), *aff'd* 525 F.2d 409 (8th Cir. 1975); *Tims v. Board of Education of McNeil, Arkansas,* 452 F.2d 551, 552 (8th Cir. 1971). Such considerations did not enter into any of defendants' decisions regarding plaintiff.

11. Statistics are not irrefutable; they may be rebutted. "In short their usefulness depends on all of the surrounding facts and circumstances." *Teamsters v. U. S.,* 431 U.S. 324 at 340, 97 S.Ct. 1843 at

1857, 52 L.Ed.2d 396 (1977). The statistics presented by plaintiff were inconclusive and plaintiff's expert could offer no probative opinion regarding the significance of their statistics in a Title VII context.

12. Conversely, the statistics presented by defendants establish that the employment patterns at SSIE are consistent with fair or racially neutral equal employment opportunity policies. This statistical showing of no disparate treatment by defendants was not rebutted by the plaintiff.

13. Plaintiff clearly offered no showing of statistical disparities sufficient to establish a prima facie case and/or prove its case of discrimination against the individual plaintiff or fact indicative of any racial discrimination on the part of defendants.

14. The plaintiff was not subjected to retaliation or discrimination because of the filing of his charge or his opposition to alleged discriminatory practices.

15. Plaintiff has not proven that defendants violated the Civil Rights Act of 1964 (as amended) or of 1866, 42 U.S.C. §§ 2000e et seq., § 1981.

16. There is no basis in fact that discrimination on the basis of race was a consideration whatever in regard to the action of defendants taken with respect to plaintiff.

17. Judgment shall be entered for the defendants.

An Order consistent with the foregoing has been entered this day.